# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Rojas*, 2013 IL App (1st) 113780

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JUAN ROJAS, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-3780 |
| Filed | October 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The grant of defendant's motion to quash a warrant for the search of his residence and to suppress evidence was affirmed, since the warrant lacked probable cause and the good-faith exception to the exclusionary rule was not applicable where the suggestion in the complaint that drug traffickers keep records in their residences was not supported by any details, and without details, the suggestion was only conjecture and left the complaint without any substantial basis for a finding of probable cause. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 07-CR-5846, 09-CR-21303; the Hon. Thomas M. Davy, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Alan. J. Spellberg, Veronica Calderon Malavia, Carol L. Gaines, and Neangela L. Marshall, Assistant State's Attorneys, of counsel), for the People.

Thomas M. Breen, Todd S. Pugh, and Jonathan M. Brayman, all of Breen Pugh & Associates, of Chicago, for appellee.

Panel

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justice Fitzgerald Smith concurred in the judgment and opinion.
Justice Epstein dissented, with opinion.

**OPINION**

¶ 1    Defendant Juan Rojas was charged by information with two counts of unlawful use of a weapon by a felon. The trial court granted defendant's motion to quash the search warrant and suppress evidence. The State appeals, contending the trial court erred in finding the search warrant lacked probable cause to search defendant's residence and that the trial court erred in failing to apply the good-faith exception to the exclusionary rule when it suppressed the evidence against defendant.

¶ 2                    BACKGROUND

¶ 3    Two complaints for search warrant were filed in this case. Drug Enforcement Agency (DEA) Special Agent Nicholas Loonan filed the first on October 16, 2009, and DEA Special Agent Thomas Asselborn filed the second on October 20, 2009. Both complaints were subscribed and sworn to before circuit court Judge Paul P. Biebel and are apparently identical except for the agent's listed years of experience. On October 20, 2009, Judge Biebel issued a single warrant to Agent Asselborn to search defendant and his residence at 745 Cromwell Avenue in Westchester, Cook County, Illinois, and to seize records or evidence relating to narcotics racketeering, money laundering, proceeds of illicit narcotics or trade, and criminal drug conspiracy. This included such things as books, ledgers, bank statements, photographs, income records, real estate contracts, etc. Although the parties have expressed some confusion as to which complaint to reference, we rely on the October 20 complaint sworn to by Agent Asselborn, as that is the complaint identified in the search warrant that ultimately issued.

¶ 4    Agent Asselborn prefaced the complaint by stating that he had been a DEA agent since 1998 and assigned to the money laundering group in Chicago since 2004. He had received training and participated in drug and money laundering investigations, as well as been involved in numerous search warrants resulting in the seizure of items from drug trafficking.

-2-

In Asselborn's experience, large-scale narcotics traffickers almost always kept detailed records to track their drug transactions and large-sum money laundering, and they also used multiple locations to conduct their narcotics activities. Agent Asselborn concluded, "[s]uch records are often maintained under dominion and control of the narcotics traffickers, and as such, are often kept in their residences or other secure locations that cannot be easily identified by law enforcement."

¶ 5    The complaint in support of search warrant identified five alleged drug traffickers, including defendant and the alleged head of the organization, Felix Villasenor, with six of their residences or "stash houses" to be searched. Agent Asselborn explained that the search was part of "Operation Copperhead," an investigation initiated by DEA agents in Los Angeles and Chicago targeting the "Villasenor DTO," a nationwide drug trafficking organization that allegedly distributed narcotics and laundered money (although the complaint leaves DTO undefined, we reasonably presume it to mean "Drug Trafficking Organization"). Asselborn stated that, to date, the California operation had resulted in the seizure of 37.5 kilograms of cocaine, heroin, $391,566, and the arrest of six individuals. Meanwhile, the Cook County operation had already resulted in the seizure of 31.5 kilograms of cocaine, about $100,000, and the arrest of four Villasenor DTO associates. The investigation used nonconsensual wiretaps of the telephones of Villasenor (also known as Chivo) and other Villasenor DTO members or associates. The applications for these wiretaps were incorporated in the complaint for search warrant.

¶ 6    Based on the evidence collected, investigators believed that Villasenor supplied heroin, cocaine, and marijuana for the Villasenor DTO in Chicago and that Villasenor obtained his narcotics from various sources, including defendant. Intercepted telephone calls also led agents to believe that defendant supplied cocaine to Villasenor, who then supplied cannabis and heroin to defendant. In the "summary of probable cause," the complaint listed the six addresses to be searched, and under each address, Agent Asselborn described the observation- and electronic-based surveillance that led officers to believe the individuals identified were committing drug crimes based out of those specific locations.

¶ 7    Relevant to this appeal, the complaint sought to search 6207 South Parkside, Chicago, an alleged stash house used to store narcotics and cash proceeds. Per the complaint, this house had been rented out by the owner (not defendant) to a person (also not defendant) who had previously been arrested for cocaine possession. In support of probable cause for that location, Agent Asselborn identified two intercepted telephone conversations during the evening of July 3, 2009, which led him to believe that defendant advised Villasenor to pick up money from the Parkside house, but defendant told Villasenor to do so without raising the suspicion of neighbors. Following this conversation, the complaint stated that officers actually observed Villasenor enter the porch, where he met defendant and then went inside the house. The complaint further stated that numerous other intercepted telephone calls "indicated" defendant supplied drugs to Villasenor and that defendant was also a customer of Villasenor's for drugs, and specifically alleged that officers believed the Parkside address was where defendant stored his drugs and drug proceeds.

¶ 8    The complaint also sought to search defendant's residence and the home believed to be owned by his parents, located at 745 Cromwell Avenue in Westchester, Cook County,

Illinois. The wiretap conversations identified in support of probable cause were apparently from Villasenor's telephone. On July 3, 2009 at 4:23 p.m., Villasenor called defendant, and this conversation ensued:

"DEFENDANT: To see if you can come over here close to my house.

VILLASENOR: By where?

DEFENDANT: By Mannheim.

VILLASENOR: But how do I get there?

DEFENDANT: You know when you get off on the street that you take to get to Noa-Noa nightclub?

VILLASENOR: I don't know where that is. Mannheim and what?

DEFENDANT: Take 55 to La Grange. Take La Grange north until you get to Cermak."

In the complaint, Asselborn stated that based on his training and experience, this call revealed defendant had advised Villasenor to meet him by his residence, located around Cermak Road and Mannheim. Maps indicate that the intersection of Cermak and Mannheim is a little over a mile away from defendant's Cromwell address.

¶ 9     In support of probable cause to search the 745 Cromwell address, Asselborn also identified two additional conversations between defendant and Villasenor. On the afternoon of July 22, 2009, defendant called Villasenor:

"VILLASENOR: [Laughs] What's up?

DEFENDANT: Nothing. Have they given you the 'tickets'?

VILLASENOR: Well my cousin called me a little while ago and said the guy already had them and would call me at any time so he could give them to me.

DEFENDANT: Okay.

VILLASENOR: Did your guys arrive?

DEFENDANT: Yeah. But I'm going to go take a look at it first."

Asselborn explained that, based on his training and experience, he believed these conversations revealed defendant was asking Villasenor if he had received payment for a previous provision of cocaine supplied by defendant. Asselborn believed Villasenor also inquired whether a new shipment of cocaine had arrived. Defendant confirmed that the shipment had arrived but that he wanted to look at the cocaine before giving it to Villasenor.

¶ 10     The second call, occurring minutes later, was:

"DEFENDANT: Get ready and call your guy and see if he's ready.

VILLASENOR: Okay.

DEFENDANT: Call me back.

VILLASENOR: Is it for sure?

DEFENDANT: Yeah, I have them already.

VILLASENOR: Did you see them?

DEFENDANT: I saw them and they are the same as last time, but I would like for

you to see them.

VILLASENOR: You want me to see them?

DEFENDANT: Yeah, look at them over there with your friend and he can decide if it's a yes or a no. You know?

VILLASENOR: Yeah, he'll take them."

Asselborn believed that this conversation revealed defendant wanted Villasenor to prepare Villasenor's customers for a new shipment of cocaine and that he wanted Villasenor to view the cocaine before the customer received it, but Villasenor declined, indicating that he did not need to look at the cocaine.

¶ 11        As stated, on October 20, Judge Biebel issued the search warrant to search defendant and his Cromwell address. The same day, officers executed the search warrant and found a 9-millimeter handgun. Defendant stated his friends, who were gang members, gave him the gun for protection after his brother was arrested. Defendant was arrested and subsequently charged with two counts of unlawful use of a weapon by a felon for possessing a handgun after previously having been convicted of possession of a controlled substance and unlawful discharge of a weapon.

¶ 12        On July 1, 2011, defendant filed a motion to quash the search warrant and suppress evidence and statements. The State filed its response and, on October 26, 2011, the trial judge held a hearing on defendant's motion. Defendant argued there was no nexus between the criminal activity and items sought to be recovered at the Cromwell address, thus reflecting a lack of probable cause to search that location. Defendant noted that in the July 3, 2009, conversation, defendant asked Villasenor to come close to his home, not to his home, and defendant did not discuss illegal activity or why any items connected with illegal activity would be in the home. Defendant argued that the two other conversations, likewise, did not connect criminal activity to the Cromwell home.

¶ 13        The trial court agreed, finding there was no probable cause to issue the search warrant because although the application for the overall search warrant was not bare-bones, the application was bare-bones *as applied to defendant*. The court explained that per the complaint, defendant told Villasenor, "[s]ee if you can come over here close to my home"; he did not say, come to his house. In addition, while the court agreed with the magistrate's finding that defendant had a connection to the drug enterprise, the trial court found defendant was at best a minor player, noting the intercepted calls revealed defendant was only involved in the scheme a small number of times. The court concluded defendant's connection to the enterprise did not extend to the Cromwell residence. The court then cited the third prong of *United States v. Leon*, 468 U.S. 897, 922-23 (1984), to hold that the search warrant application was so lacking in indicia of probable cause regarding defendant and his Cromwell address that official belief in its existence was entirely unreasonable. The court thus determined the good-faith exception did not apply and granted defendant's motion to quash arrest and suppress evidence. The State now challenges that determination on appeal.

¶ 14                                    ANALYSIS

¶ 15        The State contends the trial court's finding of lack of probable cause to issue the search warrant was erroneous and that, even if the search warrant is found to have lacked probable cause, the officers executing the search warrant acted in good faith and therefore the evidence should not have been suppressed or the arrest quashed. The exclusionary rule provides for suppression of evidence obtained in contravention of the fourth amendment's protection against unreasonable searches and seizures. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961); *Leon*, 468 U.S. at 906. The purpose of the exclusionary rule is to deter officers from recklessly preparing search warrant affidavits and from obtaining warrants based on false or misleading information; suppression is warranted when it will further the purpose of the rule. *Id.* at 907-08, 923. Probable cause, which is required for issuance of a search warrant, measures the probability of criminal activity, rather than proof beyond a reasonable doubt. *People v. Beck*, 306 Ill. App. 3d 172, 178 (1999). Probable cause exists if the totality of the facts and circumstances known to the affiant is sufficient to warrant a person of reasonable caution to believe that an offense occurred and that evidence of that offense is at the location to be searched. *People v. Stewart*, 104 Ill. 2d 463, 476 (1984); *People v. Lenyoun*, 402 Ill. App. 3d 787, 793 (2010); *Beck*, 306 Ill. App. 3d at 177-78. In other words, there must be an established nexus between the criminal offense, the items to be seized, and the place to be searched. *Beck*, 306 Ill. App. 3d at 178-79. Reasonable inferences may be drawn to establish the nexus; direct information is not necessary. *Id.* at 179.

¶ 16        Here, because there was no evidentiary hearing on the defense motion, and we are essentially presented with the same complaint and search warrant as the trial court, our review of the order granting the motion to suppress is *de novo*, while our review of the magistrate's decision to issue the warrant remains deferential. *Leon*, 468 U.S. at 914; *People v. Cooke*, 299 Ill. App. 3d 273, 277-78 (1998); see also *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (noting the great deference accorded to a magistrate's determination of probable cause). Reviewing the matter in commonsense fashion, as we must, however, we will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause. *Leon*, 468 U.S. at 915; *People v. Sutherland*, 223 Ill. 2d 187, 219 (2006). A conclusory statement of probable cause is insufficient (*Gates*, 462 U.S. at 238; *People v. McCarty*, 223 Ill. 2d 109, 152 (2006)), and reviewing courts will not defer to a warrant based on a bare-bones affidavit or blindly follow a magistrate's probable cause finding (*People v. Heiber*, 258 Ill. App. 3d 144, 149, 152 (1994) (citing *Leon*, 468 U.S. at 915)).

¶ 17        In this case, the complaint for search warrant set forth facts for the alleged probable cause to search each of the five addresses and named individuals, including defendant and his Cromwell residence. While the warrants that presumably issued with respect to the other identified addresses and individuals are not at issue before us, it merits mention that the complaint specified that the field and telephone surveillance had clearly connected these various individuals to illegal activity in the places to be searched. For example, with regard to one address identified in the complaint, Agent Asselborn overheard a conversation indicating the suspected drug trafficker was at the house counting money from drug proceeds. Also, with regard to the Parkside address, on July 3, 2009, officers overheard

defendant advise Villasenor to go collect money from that stash house without raising the neighbors' suspicion, and then they actually observed Villasenor and defendant at the house. Agent Asselborn stated intercepted calls gave them reason to believe the Parkside address was where defendant stored his drugs and drug proceeds. While conclusory, this evidence at least connected defendant's alleged drug activity to the Parkside house.

¶ 18      We cannot say the complaint sets forth the same level of evidence regarding the Cromwell address. The evidence demonstrating probable cause consisted only of intercepted telephone conversations that to the average person would appear relatively innocuous. If we credit Agent Asselborn's interpretations of these cryptic conversations, they certainly suggest that the criminal activity of drug trafficking was afoot around July 22, 2009. Critically, however, they do not indicate where the drug trafficking was occurring. While the July 3, 2009, wiretapped conversation indicates defendant requested that Villasenor "come over here close to my house," there is no direct observational evidence that the two actually met or conducted *any* transaction and no indication as to why they were meeting. Notably, the above-referenced conversation suggests Villasenor did not know where defendant's Cromwell house was located and had not been there before. The closest evidence indicating that they might have met appears near the end of the Cromwell portion of the complaint when Agent Asselborn states that, in September, officers observed the "same vehicle" in defendant's Cromwell driveway that defendant "had driven to meet with Felix VILLASENOR on July 3"; but the complaint offers nothing more. While the dissent characterizes the July 3 conversation as evidence of a "drug transaction," we do not believe that presumption can be made on these facts. Had law enforcement seen or heard defendant leave his residence, meet with Villasenor, and hand him a package, for example, this analysis would likely be different. But as it stands, the only fact supporting probable cause to believe that evidence of defendant's illegal activity could be found at the Cromwell residence was Agent Asselborn's generic offering that drug trafficking records "are often maintained under dominion and control of the narcotics traffickers, and as such, are often kept in their residences or other secure locations that cannot be easily identified by law enforcement." Had there been details in the complaint supporting this observation, it could easily rise to the level of an inference. But, without more, in this particular instance, it was mere conjecture. See *Hieber*, 258 Ill. App. 3d at 152 (affidavit of police officer seeking warrant was "a conclusory statement based on his own bare conclusions"); see also *United States v. Rios*, 881 F. Supp. 772, 774-77 (D. Conn. 1995) (officer's general statements based on training and experience alone do not constitute "substantial basis" for the issuance of a warrant). Moreover, as the trial court observed, evidence in the complaint and applications for wiretaps showed defendant, in comparison to the others, to be a minor player in the drug trafficking scheme. The complaint does not betray a substantial basis for finding probable cause to search defendant's 745 Cromwell address.

¶ 19      In reaching this conclusion, we find defendant's case distinguishable from *Beck*, on which the State relies. In *Beck*, the 16-page affidavit offered direct evidence that two confidential informants confirmed the defendant's involvement in a gang-related drug operation; described his properties to be searched; and also described his four vehicles, two of which officers later observed at the properties to be searched. Significantly, the affidavit

also supplied direct evidence that the defendant (who at the time of the case had drug charges pending against him) had purchased the properties at issue under an alias name even though he had not paid income taxes and had no evident employment. The affiant added that drug dealers keep records of their transactions in their residences and often use multiple addresses under aliases to avoid detection. Accordingly, direct evidence supported the officer's inference that defendant was engaged in drug activity at the properties to be searched. The *Beck* court concluded the evidence of criminal activity, together with the officer's inference, supported the magistrate's finding of probable cause to search the defendant's home and thus determined the affidavit was not bare-bones as applied to the defendant. *Beck*, 306 Ill. App. 3d at 180-81.

¶ 20     In this case, unlike in *Beck*, the direct evidence of defendant's criminal drug activity was minimal at best, and there was absolutely no direct evidence tying defendant's supposed drug activity, or any other misdeeds, to his family home. Were we to find that to be the case, we would be adding layers of conjecture upon conjecture, which we will not do. It is the affiant's job to set forth sufficient facts so that reasonable inferences can be made.

¶ 21     The State next argues that even if this court finds the complaint for search warrant to be unsupported by probable cause, the evidence was nevertheless admissible because the officers' good faith reliance on the search warrant prevents suppression. The good-faith exception prevents suppression of evidence obtained by an officer acting in good faith and in reliance on a search warrant that was ultimately found to be without probable cause "where the warrant was obtained by a neutral and detached judge, free from obvious defects other than nondeliberate errors in preparation, and containing no material misrepresentations." *Beck*, 306 Ill. App. 3d at 180 (citing 725 ILCS 5/114-12(b)(1), (b)(2) (West 1996)). The good-faith exception does not apply in four situations, one of which is at issue here: where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon*, 468 U.S. at 922-23. That is, if the officer who provided the affidavit in support of a search warrant did not possess an objectively reasonable belief in the existence of probable cause, then suppression is the appropriate remedy. *Lenyoun*, 402 Ill. App. 3d at 792-93. Whether the good-faith exception applies in a particular instance warrants our *de novo* review. *People v. Turnage*, 162 Ill. 2d 299, 305 (1994).

¶ 22     The State argues the good-faith exception applies here because the complaint was not bare-bones in that "it set forth details of an extensive investigation and described the affiant agent's considerable experience," together with evidence of defendant's ongoing criminal activity. The State argues, as a result, the officer's belief in the validity of the warrant was not unreasonable. This argument is without merit. While the 20-page complaint is not bare-bones in and of itself, *it is bare-bones with regard to defendant's Cromwell address*. As stated, the nearly two pages of "probable cause" evidence attempting to create a nexus between defendant's criminal drug trafficking activity and his family's Cromwell home was entirely lacking. See *People v. Reed*, 202 Ill. App. 3d 760, 764 (1990) (good-faith exception inapplicable where affidavit was bare-bones and search warrant was overbroad); *cf. Beck*, 306 Ill. App. 3d at 181 (good-faith exception applied because the 16-page complaint contained "extensive information about defendant's activities and residences," creating at

least an *arguable* basis for an officer to believe probable cause existed to search defendant's home, which he purchased under an alias). Probable cause regarding the other locations cannot be bootstrapped to supply probable cause, and by implication, good faith, for the Cromwell location. If we allow Officer Asselborn's conjecture that people involved in drug trafficking keep records of their drug activity in their homes to provide the "indicia" of probable cause necessary for application of the good-faith exception here, we fear we would be opening up any criminal to the official search of his home – as most people keep records in their homes. This is the very thing that was warned against in *Beck*. See *Beck*, 306 Ill. App. 3d at 180-81. Moreover, whether to apply the good-faith exception contemplates not just the objective reasonableness of the officer who executed the warrant, but that of the officer who obtained it and provided the material information for the probable cause determination. *Leon*, 468 U.S. at 923 n.24. In this case, an objectively reasonable officer, especially viewing the complaint in light of the overall evidence acquired, should not have found any sign of probable cause existed to search defendant's Cromwell home. See *Lenyoun*, 402 Ill. App. 3d at 794, 800 (good-faith exception inapplicable where search warrant was bare-bones and complaint failed to provide any indicia of probable cause that defendant engaged in illegal drug dealing from his apartment where police solely observed the defendant sell narcotics on the street).

¶ 23                                    CONCLUSION

¶ 24        Accordingly, the order of the circuit court of Cook County is affirmed.

¶ 25        Affirmed.

¶ 26        JUSTICE EPSTEIN, dissenting.

¶ 27        I agree with the majority that the Drug Enforcement Agency's complaint did not establish probable cause. I believe, however, that based on *People v. Beck*, 306 Ill. App. 3d 172 (1999), we are compelled to apply the good-faith exception.

¶ 28        Under the good-faith exception, evidence obtained in violation of the fourth amendment will not be excluded if an officer, acting in good faith, relied on a search warrant later found to be unsupported by probable cause. *People v. Carlson*, 185 Ill. 2d 546, 556 (1999). This exception, first expressed in *United States v. Leon*, 468 U.S. 897 (1984), and adopted by the Illinois Supreme Court in *People v. Stewart*, 104 Ill. 2d 463 (1984), has been codified by the Illinois legislature:

   "The court shall not suppress evidence which is otherwise admissible in a criminal proceeding if the court determines that the evidence was seized by a peace officer who acted in good-faith.

      *** 'Good-faith' means whenever a peace officer obtains evidence:

      (i) pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the

officer reasonably believed the warrant to be valid[.]" 725 ILCS 5/114-12(b)(1), (b)(2) (West 2008).

Despite codification, it appears that Illinois search and seizure law is still in lockstep with the fourth amendment for purposes of the question presented. See *People v. Krueger*, 175 Ill. 2d 60, 76 (1996).

¶ 29   Reliance on a warrant is usually sufficient to show that an officer acted in good faith. *Leon*, 468 U.S. at 922. But the officer's reliance on the warrant must be *objectively reasonable*. *Id.* An officer's reliance on a warrant is objectively *unreasonable*–and suppression and exclusion are therefore appropriate–where (1) the judge issuing the warrant was misled; (2) the judge issuing the warrant wholly abandoned his neutral role; (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was facially deficient. *Id.* at 922-23; *Beck*, 306 Ill. App. 3d at 180. This case concerns only (3) above.

¶ 30   The majority declines to apply the good-faith exception on the basis that the affidavit was bare-bones as it related to defendant's Cromwell home. *Supra* ¶ 22. I respectfully disagree. Special Agent Asselborn's 20-page complaint named five persons and six residences. It devoted 1.5 pages to defendant's residence, as well as another page to defendant's second residence (not at issue here). The complaint also described the drug trafficking organization's activities in detail and mentioned defendant several times. The complaint was not bare bones; it was actually quite detailed. It did, however, have a weak nexus between defendant's drug trafficking, the items to be seized–here, an eight-paragraph list, including bank records and any electronic devices–and defendant's residence. *Beck*, 306 Ill. App. 3d at 178.

¶ 31   *People v. Beck* is instructive as to the nexus between a defendant's residence and drug sales. In *Beck*, a search warrant for the defendant's residence was issued based on evidence that defendant lived there; evidence that he sold drugs; and the officer's belief, based on his eight years' experience, that the residence contained drug sales records. *Id.* at 174-75. A search produced inculpatory evidence, but the trial court granted defendant's motion to quash, because the complaint did not show a nexus between defendant's drug trafficking and his residence. *Id.* at 177. This court reversed on appeal, finding sufficient evidence for probable cause. *Id.* at 179. This court further held that, under *Leon* and its progeny, "[e]ven if the question of probable cause is close here, the officers' good-faith reliance on the search warrant prevents suppression." *Id.* at 180. The *Beck* court noted that the affidavit was not bare bones, but rather a 16-page description of defendant's activities and residences that "presented at least an arguable showing of probable cause." *Id.* at 181. The court concluded that the "officer's belief in the validity of the warrant and affidavit was not unreasonable." *Id.*

¶ 32   Here, as in *Beck*, the complaint contained no facts directly connecting defendant's drug trafficking and residence. *Id.* When there is no direct information to establish a nexus, however, "reasonable inferences may be entertained to create the nexus." *Beck*, 306 Ill. App. 3d at 179; *People v. McCoy*, 135 Ill. App. 3d 1059, 1066 (1985). Specifically, "it is commonly held that this gap can be filled merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at

home." *Beck*, 306 Ill. App. 3d at 178 (quoting 2 Wayne R. LaFave, Search and Seizure § 3.7(d), at 379 (3d ed. 1996)). In this case, Asselborn swore to just that: "Based on my training and experience, it is my opinion that people involved in large scale narcotics trafficking and/or money laundering almost always keep records of their transactions \*\*\* in their residences or other secure locations." This was sufficient for application of the good-faith exception, which is a markedly different standard than probable cause. See *Beck*, 306 Ill. App. 3d at 178; see also LaFave, *supra*, § 3.7 (collecting cases stating that a sufficient nexus exists where affiant stated that, based on his experience, drug dealers often keep evidence at their homes). Put another way, if the facts in *Beck* established probable cause, similar facts here certainly justify applying the good-faith exception.

¶ 33   The majority distinguishes *Beck*, noting that the defendant in that case had failed to pay taxes, was unemployed, owned multiple vehicles, purchased residences under an alias, and was involved in a gang-related drug operation. *Supra* ¶ 20. However, most of this evidence–the residences, vehicles, tax and employment history, and information from two confidential informants that confirmed defendant's involvement in a gang-related drug operation–has nothing to do with the question here: whether there was a sufficient nexus between defendant's drug trafficking and residence. Indeed, the only fact mentioned by the majority that meaningfully distinguishes *Beck* from this case is the defendant's use of an alias to acquire a home, as it may suggest that he used the home for an illegal operation. In *Beck*, as here, there was ample evidence that defendant lived at the residence and that he sold drugs. Only an officer's experience–and, in *Beck*, purchasing a home with an alias–established a nexus between the two.

¶ 34   There is an additional fact here that is absent in *Beck*: Asselborn attested that Rojas advised Chivo Villasenor to "meet him by his (ROJAS') residence" for a drug transaction. Asselborn quoted the following conversation in support:

> "ROJAS: To see if you can come over here close to my house. [*sic*]
>
> CHIVO: By where?
>
> ROJAS: By Mannheim.
>
> CHIVO: But how do I get there?
>
> ROJAS: You know when you get off on the street that you take to get to Noa-Noa Nightclub?
>
> CHIVO: I don't know where that is. Mannheim and what?
>
> ROJAS: Take 55 to La Grange. Take La Grange north until you get to Cermak."

Although this suggests a transaction near, not at, defendant's home, several decisions from other jurisdictions have held that drug sales near a defendant drug dealer's home provide a sufficient nexus for probable cause. See *United States v. Jones*, 159 F.3d 969, 974-75 (6th Cir. 1998) ("In this case, the fact that the incidents referred to in the affidavits took place on the premises rather than inside the house does not invalidate the search of the house. The recited statements supporting the search warrant and the fact that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live' [citation] support a finding of probable cause to support the issuance of the warrant."); *United States v. Singleton*, 125 F.3d

1097 (7th Cir. 1997) (cocaine sales in vicinity of residence were sufficient for probable cause); *United States v. Stefanson*, 648 F.2d 1231 (9th Cir. 1981) (drug sales one mile from defendant's home supported probable cause).

¶ 35 I recognize, as the *Beck* court did, that the potential danger in applying the good-faith exception to cases such as this is that courts will begin "opening up our citizens' homes upon the mere commission of a crime and an affidavit of a law enforcement officer." *Beck*, 306 Ill. App. 3d at 180-81. Here, however, defendant did not engage in an isolated drug sale, and the affidavit was not "bare bones." Rather, surveillance showed that defendant engaged in long-term drug trafficking and that, on at least one occasion, a transaction occurred near his residence. Additionally, Asselborn averred that, given his experience, he believed that defendant's residence contained bank records and other evidence of his continued criminal involvement. While this may have fallen short of probable cause, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

¶ 36 Finally, the exclusionary rule's purpose is to deter police misconduct. *Leon*, 468 U.S. at 916, 920-21. Here there was no sign of misconduct. At worst, Special Agent Asselborn provided thin grounds for the issuance of a search warrant for defendant's residence. Still, a warrant issued by a magistrate normally suffices to show that the officer acted in good faith. *Id.* at 922. " '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' " *Id.* at 921 (quoting *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring)). I do not believe that suppressing the evidence here would deter police misconduct.

¶ 37 For these reasons, I would reverse the trial court's order quashing defendant's arrest and suppressing evidence.