# Illinois Official Reports

## Appellate Court

---

### *People v. Rodriguez*, 2017 IL App (1st) 141379

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SEBASTIAN RODRIGUEZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-1379 |
| Filed<br>Rehearing denied | May 8, 2017<br>June 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-21347; the Hon. Michael J. Howlett, Jr., and the Hon. Neera L. Walsh, Judges, presiding. |
| Judgment | Affirmed in part; sentence vacated; cause remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Philip D. Payne, of State Appellate Defender's Office, of, Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, Noah Montague, and Sari London, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion.<br>Justice Harris and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1     Fifteen-year-old Sebastian Rodriguez was charged with first degree murder in connection with the shooting of thirteen-year-old Sameere Conn on October 1, 2008. At the time of the offense, 15-year-olds charged with first degree murder were automatically excluded from juvenile court jurisdiction. Sebastian was accordingly tried, convicted, and sentenced as an adult. Following his jury trial, the circuit court sentenced Sebastian to 50 years in prison: 25 years for the murder and 25 additional years pursuant to a mandatory firearm enhancement. In this direct appeal, Sebastian argues that (1) the circuit court erroneously denied his motion to suppress evidence found during a search of his home, (2) expert testimony identifying a revolver found in his home as the murder weapon was improperly admitted without a hearing to determine if it was based on generally accepted scientific methodologies, and (3) the imposition of a 50-year sentence on an offender who was 15 years old at the time of his offense is unconstitutional.

¶ 2     Shortly after Sebastian filed his notice of appeal, the Illinois legislature raised the age of automatic transfer from juvenile court to criminal court for an individual charged with first degree murder from 15 to 16 years of age and adopted additional sentencing guidelines for defendants who were under the age of 18 at the time of their offenses, including making firearm enhancements discretionary, rather than mandatory, for such individuals. In supplemental briefing, Sebastian argues that these amendments should apply to his case.

¶ 3     For the reasons that follow, we affirm Sebastian's conviction for first degree murder, vacate his sentence, and remand this matter to the juvenile court.

## BACKGROUND

### A. Pretrial Proceedings

¶ 6     Nine days after Sameere Conn's death, Chicago police obtained a warrant to search Sebastian Rodriguez's home for evidence related to the shooting. In the complaint for the search warrant, Detective Ricky Bean identified two eyewitnesses who testified before a grand jury that they knew Sebastian and saw him, dressed in a hooded sweatshirt, fire shots into the convenience store where Sameere was killed, as well as a third eyewitness who identified Sebastian as the individual he saw looking through the glass window of the store's door just before shots were fired through that window. According to the complaint, officers also learned from two other witnesses that Sebastian was known to possess a "kill list" of potential victims that included Sameere. Finally, the complaint alleged that, in connection with prior arrests, Sebastian had given the address 10744 South Hoxie Avenue in Chicago as his home address.

¶ 7     Finding this sufficient to establish probable cause, the circuit court issued a warrant to search Sebastian's home for "[o]ne dark colored or grey hooded sweat shirt, [o]ne document containing a list of individual names, [a]nd one handgun." Officers executed the warrant on October 11, 2008, retrieving a revolver from under a floorboard in the bathroom and a number of hooded sweatshirts from elsewhere in the home.

¶ 8     Sebastian was charged by grand jury indictment with first degree murder.

¶ 9     In his motion to suppress filed on April 26, 2010, Sebastian argued that evidence recovered during the October 11, 2008, search should be excluded because, even if officers had probable

cause to arrest him, they had no reason to believe that specific evidence would be found in his home 10 days after the shooting.

¶ 10    Although an evidentiary hearing was held on Sebastian's motion to suppress, the testimony offered related only to the scope of the search and the manner in which it was conducted, issues that are not raised in this appeal. The circuit court denied Sebastian's motion, explaining that, in its view, when officers have "a strong identification of a suspected shooter and that person's home," then "it is not beyond logic, nor *** beyond the law, to have probable cause to see if in that person's place of residence, the place they call home, the place in which they keep their items, that there might be evidence of the crime there."

¶ 11    On May 9, 2013, Sebastian moved for an evidentiary hearing, pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), on the admissibility of expert testimony he expected the State to introduce linking the gun found in his home to a bullet recovered from the scene of the crime. Although he acknowledged that such testimony had historically been admitted by courts, he insisted a *Frye* hearing was needed because the reliability of the methodologies employed by ballistics experts had recently been questioned in the scientific community.

¶ 12    The circuit court disagreed and denied Sebastian's motion. Noting that it was aware of no published opinion of any court concluding that firearm identification evidence was not generally accepted in the scientific community, the court concluded that Sebastian's concerns went to the weight and not to the admissibility of the evidence.

¶ 13                                                    B. Trial

¶ 14    A four-day trial in this case began on February 4, 2014. Because Sebastian does not contest the sufficiency of the evidence to support his conviction, we include only a brief summary of the trial testimony, with a fuller recitation of the firearms identification testimony, to provide context for the evidentiary issues raised on appeal.

¶ 15    At approximately 8 p.m. on October 1, 2008, Sameere walked home from nearby Trumball Park after a football game with a group of his friends from school. Sameere and two other boys stopped to purchase snacks at Hook's Finer Foods, a convenience store located at 106th Street and Bensley Avenue in Chicago, while two other friends waited outside. A handful of people were in the store at the time: the cashier, the owner of the building, and a few customers, including an individual known as "Tone" or "Tony," who was known to frequent the store. Sameere was near the front of the store waiting to make his purchase when, according to witnesses, he was shot multiple times through a window in the front door of the store.

¶ 16    Joseph Neal and John Rodgers testified that, on the evening of October 1, 2008, they were waiting across the street from Hook's Finer Foods for Sameere and the others when they saw Sebastian, who they knew and regularly saw around the neighborhood, approach the store. According to Joseph and John, Sebastian looked at them, put the hood of his sweatshirt up, and started firing a gun into the store. At trial, both boys insisted that Sebastian's sweatshirt was red—Joseph said "[i]t was red, same red as he always had"—and denied previously telling officers and a grand jury that it was blue and gray. Joseph also denied telling the grand jury that he and John were standing farther away from the store, near some offices. However, Joseph acknowledged that he initially told officers and a television reporter that he was inside the store and saw Sebastian tap on the glass before shooting. When asked why he lied, Joseph explained that he thought the better vantage point would make him more believable: "I knew who I seen and I really wanted [Sebastian] to get got for what he did, that's why I said all of that."

¶ 17    Anthony Ray (also known as "Tone" or "Tony"), who was in custody for failing to appear as a witness in this case, acknowledged his previous convictions for stealing a car and for selling drugs and that he was a diagnosed schizophrenic who took medication for that condition. Anthony testified that he was at Hook's Finer Foods just before 8 p.m. on the evening of October 1, 2008, and saw a light-skinned person wearing "a black hoody" standing outside just before shots were fired through the front door of the store. Although Anthony at first told officers that he did not see the shooter, he identified a photo of Sebastian for police officers several days later, writing on the photo, "I saw him shoot through the window. Positive." However, at trial Anthony indicated that his identification was influenced by "two young kids" who were also in the store at the time of the shooting and were taken to the police station with him for questioning. Anthony explained: "I didn't personally, personally, like myself, describe that—the person that did the shooting ***. It's kind of like, kind of like I put two and two together. I seen a face and a hoody and everybody else saying they knew his name and they knew everything that happened."

¶ 18    The State called two friends of Sameere's, Kiante Lilly and Mario Martinez, to describe Sebastian's statements and conduct prior to the shooting. Kiante testified that, at Sameere's request, he set up a three-way telephone call in late September to try to resolve "a dispute" between Sameere and Sebastian. Although Kiante told the grand jury that, during that conversation, Sebastian said he had a "death list" and told Sameere "[y]ou on there, too, boy," at trial Kiante denied such a list was ever discussed, characterizing the call as nothing more than "a friendly conversation." Mario testified that Sebastian got out of a green truck and approached Mario on the evening of October 1, 2008, asked Mario if he wanted "to go take a ride," and showed him a gun—a revolver, "I don't really know, like a .38"—that Sebastian had wrapped in a sweater. Mario declined and went inside. Although Mario heard shots soon after, he did not learn that Sameere had been killed until the next morning and did not tell officers about his encounter with Sebastian until they sought him out for an interview 10 days later.

¶ 19    The physical evidence in this case consisted of (1) a medium caliber lead bullet fragment recovered from Sameere's body; (2) a fired bullet recovered from a shelf inside Hook's Finer Foods on October 1, 2008; (3) a gunshot residue collection kit consisting of swabs of each of Sebastian's hands plus a control swab, which was administered by police officers shortly after midnight on October 2, 2008; (4) a blue steel .357 Dan Wesson revolver containing six .357-magnum caliber unfired cartridge cases, retrieved from under the floorboards of the bathroom during the October 11, 2008, search of the home at 10744 South Hoxie Avenue in Chicago; and (5) two gray and five black "hoody jackets" also recovered during that search.

¶ 20    Brian Mayland, a pattern evidence program manager for the Illinois State Police forensic sciences command, testified as an expert in the field of toolmark and firearm identification. Mr. Mayland previously worked for 17 years as a forensic scientist in firearms and toolmark identification and, for just over one year, as a laboratory director. Although his undergraduate degree was in business, Mr. Mayland testified that he had completed specialized training in the field of firearms identification, including a two-year training program conducted by the Illinois State Police, and had testified as an expert in the field approximately 80 times.

¶ 21    Mr. Mayland explained that a cartridge consists of four basic components: the case; the powder inside the case; the bullet, which is seated inside of the case; and the primer, a pressure-sensitive chemical compound located in the head of the case. When a gun is fired, the primer is struck, the resulting spark ignites the powder, gasses from the burning powder create

pressure, and the pressure forces the bullet from the mouth of the cartridge down the barrel where rifling—raised and lowered areas known as "lands" and "grooves"—form a twisting pattern along the inside of the barrel that causes the bullet to spin. Mr. Mayland testified that, as a firearm analyst, he uses a comparison microscope to examine two bullets or cartridge cases and compare the marks that are left behind on those items as a result of the firing process. Certain identifying features—like the caliber of the bullet, the number and width of the grooves in the rifling, and the direction of the twist—are known as "class characteristics"; they are present at the time of manufacture and common to an entire class of firearms. Other marks are created by imperfections that develop in a gun over time, as it is fired, and can be unique to a particular gun.

¶ 22    In this case, Mr. Mayland examined the fired bullet recovered from the scene of the crime and determined that it was a .38-caliber bullet jacket with six lands, six grooves, and a right-hand twist. He concluded that the metal fragment recovered from Sameere's body was too mutilated to be suitable for comparison. Mr. Mayland then test fired the revolver recovered from Sebastian's house, shooting four bullets into a tank of water, which slows the bullets without damaging them. He compared the test shots to each other to determine if he "could identify test shot with test shot," something he acknowledged is not always possible. In this case he determined that it was. He then compared the test shots side by side with the fired bullet under a comparison microscope. It was Mr. Mayland's opinion "that the fired bullet jacket was fired in that firearm."

¶ 23    Defense counsel objected to Mr. Mayland providing this conclusion without elaborating on the specific similarities or differences between the compared specimens that he relied upon as the basis for his opinion. The court sustained the objection, pending further inquiry. When asked to elaborate, Mr. Mayland stated that he "saw a sufficiently similar pattern of individual characteristics that allowed [him] to form an opinion." Specifically, "[t]here were striated marks that lined up when [he] was doing the comparison from the evidence bullet to the test fired bullet." Defense counsel again objected, but this time the trial court overruled the objection.

¶ 24    On cross-examination, Mr. Mayland acknowledged that six is the most common number of lands and grooves and it is "very common" for a revolver to have six lands and grooves with a right-hand twist. Based on Mr. Mayland's experience, he believed that hundreds of guns in Chicago could have those same characteristics, noting, however, that he could not be more specific because gun manufacturers "are very close" with such information.

¶ 25    Mr. Mayland also noted that the bullet jacket he analyzed was "badly mutilated," consistent with it having struck something. "Based on the condition of the bullet jacket," he said he measured at least two and "probably three" lands and grooves, although he did not know that for certain and did not document his measurements in his notes. Mr. Mayland acknowledged that none of the test shots matched the fired bullet casing exactly. However, he also stated that "no two test shots will ever look exactly the same." Mr. Mayland insisted that, in this case, "there was a sufficiently similar pattern" between the test shots and the fired bullet case for him to form his opinion. Mr. Mayland agreed both that there is no nationally recognized standard to determine that the patterns were close enough to have been generated by the same gun and that his opinion was a subjective one, not capable of verification by objective testing.

¶ 26    On redirect examination, Mr. Mayland reiterated that he has compared tens of thousands of bullets and cartridge cases over his career, that he followed all Illinois State Police lab protocols, and that he used methods commonly accepted in the field of firearms identification. Mr. Mayland confirmed that nothing he was asked during cross-examination affected his opinion that the bullet he analyzed was fired from the revolver found in Sebastian's home.

¶ 27    Mary Wong, a forensic scientist with the Illinois State Police forensic sciences division, testified as an expert in the field of gunshot residue analysis. Ms. Wong tested the swabs from the residue collection kit administered to Sebastian and the hooded sweatshirts retrieved from his home. None of the items tested positive for gunshot residue. Although Ms. Wong found two "tricomponent particles" on the sample taken from Sebastian's left hand and one on the sample taken from his right hand, she explained that at least three particles from the same sample are required to make a positive identification. All Ms. Wong could conclude from her analysis was that Sebastian "may not have discharged the firearm with either hand" and, "if he did, then the particles were either removed by activity or not deposited or not detected by the procedure." Although tricomponent particles are found in fireworks and car airbags in addition to gunshot residue, Ms. Wong stated that other particles one would expect to find following contact with those items were not present in the samples she tested. However, she acknowledged that gunshot residue particles may be transferred to a person who touches a surface in a room where a gun was fired or who comes in contact with someone who recently fired a gun.

¶ 28    Sebastian did not testify but presented the testimony of several witnesses.

¶ 29    Rosa Silva, an investigator with the public defender's office, testified that, in 2013, Joseph Neal told her that on the night of October 1, 2008, he saw a person with a red hoody sweatshirt but that it was dark and he could see only the skin on the left side of the person's jaw. Joseph told Ms. Silva he thought the person was Sebastian because of the hooded sweatshirt.

¶ 30    Sebastian's father, Steven Rodriguez, Sr., testified that in October 2008 he owned a green Dodge Dakota and lived at 10744 South Hoxie Avenue in Chicago with his five sons. Mr. Rodriguez's two oldest sons, Steven Jr. and David, who were, respectively, 21 and 20 years old, were members of the Latin Counts gang and had their friends over to the house "[a]ll the time."

¶ 31    Steven Rodriguez, Jr., testified that Sebastian came home alone after school on October 1, 2008, and remained in his room until police officers arrived around 8:15 p.m. On cross-examination, Steven acknowledged that he was in the front of the house watching TV and playing video games and was not looking at the back door. Steven did not ever tell the police that Sebastian had been at home with him because he did not think they would believe him.

¶ 32    Frank Maizer testified that he owned the building where Hook's Finer Foods is located and was in the store on the night of October 1, 2008. According to Mr. Maizer, the store had four surveillance cameras, but they were not recording that day because the memory was full. He denied telling officers that he had inadvertently erased the videos but agreed that he might have told them that Anthony Ray removed an object from his mouth before the police arrived.

¶ 33    In its closing argument, the State urged the jury to believe the eyewitness testimony identifying Sebastian as the shooter, which was corroborated by the particles of gunshot residue found on Sebastian's hands and Mr. Mayland's testimony that the gun found in Sebastian's home was the murder weapon. Defense counsel responded by pointing out that

there were innocent explanations for a few particles of gunshot residue to be on a person's hands and attacked Mr. Mayland's conclusions as not being based on objective standards or specific measurements. Defense counsel argued that, following the shooting, Sameere's friends heard a rumor that Sebastian killed Sameere and were willing to lie about what they saw to make sure he was convicted. According to defense counsel, it was more likely that some unidentified shooter intending to shoot Anthony Ray, a former gang member who was carrying drugs at the time, had inadvertently shot Sameere.

¶ 34    The jury found Sebastian guilty of first degree murder, and the circuit court denied his motion requesting a new trial, in which he argued that the circuit court erred when it denied both his motion to suppress and his motion for a *Frye* hearing. Following a hearing, the court sentenced Sebastian to 25 years in prison for first degree murder (730 ILCS 5/5-4.5-20(a) (West 2014)), plus a mandatory sentencing enhancement of 25 additional years for personally discharging the firearm that caused Sameere's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2014)), and 3 years of mandatory supervised release (730 ILCS 5/5-8-1(d)(1) (West 2014)). The court denied Sebastian's motion to reconsider his sentence, and Sebastian appealed.

¶ 35                                    JURISDICTION

¶ 36    Sebastian was sentenced by the circuit court on March 31, 2014, and timely filed his notice of appeal on April 15, 2014. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case (Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013)).

¶ 37                                    ANALYSIS

¶ 38    On appeal, Sebastian argues that his conviction for first degree murder should be reversed, both because the circuit court erroneously denied his motion to suppress the evidence resulting from the search of his residence for a lack of probable cause and because the circuit court should have conducted a *Frye* hearing before admitting the testimony of the State's expert on toolmark and firearms identification.

¶ 39    Sebastian also challenges his sentence, arguing both that it was unconstitutional when it was imposed and that an amendment to the exclusive jurisdiction statute changing the age from 15 to 16 for the automatic transfer to criminal court of cases involving certain crimes should be applied retroactively to his case. Pursuant to that amendment, Sebastian asks us to vacate his sentence and remand this matter to juvenile court, where the State may seek a discretionary transfer hearing if it chooses. Sebastian alternatively argues that he is entitled to a new sentencing hearing conducted pursuant to amended sentencing guidelines for individuals who were under the age of 18 at the time of their offenses.

¶ 40    We address each argument in turn.

¶ 41                               A. Motion to Suppress

¶ 42    Sebastian initially argues that the circuit court should have granted his motion to suppress because the police lacked sufficient probable cause to search his home. Sebastian does not argue that the police lacked probable cause to arrest him for Sameere's murder, but that having this did not necessarily mean they also had probable cause to search his home for specific

evidence. According to Sebastian, the complaint submitted by Detective Bean in support of the search warrant was defective because it failed to establish a sufficient nexus between Sameere's shooting and the items sought from Sebastian's home 10 days later, *i.e.*, the murder weapon, a hooded sweatshirt worn during the shooting, and a suspected list of potential victims. The State argues that, under the circumstances of this case, it was reasonable for the circuit court to infer that such items might be found in Sebastian's home.

¶ 43    Both the United States Constitution and the Illinois Constitution require that a warrant to search an individual's home must be based on probable cause and supported by an affidavit describing the place to be searched and the items to be seized. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Probable cause exists "if facts set forth in an affidavit would cause a reasonable person to believe a crime has been committed and evidence of that crime is in the place to be searched." *People v. Damian*, 299 Ill. App. 3d 489, 491 (1998). A nexus must be established—directly or through reasonable inferences—between the criminal offense, the items to be seized, and the place to be searched. *People v. Beck*, 306 Ill. App. 3d 172, 178-79 (1999). The issuing court's task "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ***, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). Although we review a circuit court's ruling on a motion to suppress *de novo* (*People v. Pitman*, 211 Ill. 2d 502, 512 (2004)), we defer to an issuing judge's determination of probable cause and resolve any doubts in favor of upholding a warrant that has been issued (*People v. Exline*, 98 Ill. 2d 150, 156 (1983) (citing *United States v. Ventresca*, 380 U.S. 102 (1965)).

¶ 44    We are satisfied that Detective Bean's complaint established probable cause to search Sebastian's home. The police sought not only the murder weapon and a list of intended victims but a specific article of clothing—a dark-colored or gray hooded sweatshirt—identified by three eyewitnesses as something Sebastian was wearing at the time of the shooting. Although we certainly agree that probable cause to arrest does not always equate to probable cause to search the arrestee's home, it is reasonable to infer, absent evidence to the contrary, that a person will generally keep possessions, including possessions that link that person to the crime, in his or her home. See, *e.g.*, *People v. Hammers*, 35 Ill. App. 3d 498, 504 (1976) ("The complaint was sufficient to show probable cause that [the] defendant shot and killed the victim, and, if so, it was reasonable for the issuing judge to infer that the weapon used might be at the defendant's home nine days later."); *People v. Weinger*, 63 Ill. App. 3d 171, 175 (1978) (concluding that it was a "logical supposition" for the defendant to have clothing and jewelry purportedly worn by him during the murders he was charged with, as well as the murder weapon, in his apartment). Here, it was entirely reasonable to infer that Sebastian, a 15-year-old boy with no vehicle or other place to store such items, would keep a gun, clothing, and a list of potential targets at his residence.

¶ 45    In the cases relied on by Sebastian, circumstances were present that undermined the common, justified assumption that possessions are generally kept in the home. For example, Sebastian relies on *People v. McCoy*, 135 Ill. App. 3d 1059 (1985), but the defendant in *McCoy*, who was charged with possessing a firearm without a firearm owner's identification card, was an adult who was recently seen by a coworker with several guns in his van. *Id.* at 1062. Under these circumstances, where the defendant had other places available to him to keep the guns at issue—*i.e.*, at his place of employment or in his van—more was needed to say

that a fair probability existed that the guns would be found in the defendant's home. *Id.* at 1066.

¶ 46 *People v. Rojas*, 2013 IL App (1st) 113780, is similarly distinguishable. There, the only evidence supporting a warrant to search the defendant's residence consisted of cryptic telephone conversations that, although they might have suggested "that the criminal activity of drug trafficking was afoot," did not indicate where the drug trafficking was occurring. *Id.* ¶ 18. To the contrary, the conversations suggested that the other party did not know where the defendant's house was located and had not been there before. *Id.* Under those circumstances, the court in *Rojas* concluded that the officers' "generic offering that drug trafficking records 'are often maintained under dominion and control of the narcotics traffickers, and as such, are often kept in their residences or other secure locations' " did not rise above the level of conjecture. *Id.* Like the defendant in *McCoy*, who had other places available to him to store the firearms he was alleged to illegally possess, the defendant in *Rojas* could have stored such records in other locations. The absence of any evidence indicating that Sebastian, a teenager living in his father's home, had other places available to him to store his possessions distinguishes the facts of this case from those present in both *McCoy* and *Rojas*.

¶ 47 Because we conclude that probable cause existed to search Sebastian's home, we need not reach the State's alternative arguments that the good faith exception to the exclusionary rule applies or that the admission of evidence resulting from the search was harmless error.

¶ 48 B. Motion for a *Frye* Hearing

¶ 49 Sebastian also argues that the circuit court erred in denying his motion to either exclude the State's toolmark and firearm identification evidence or to hold a *Frye* hearing to determine the admissibility of that evidence. In support of his contention, both in the circuit court and on appeal, that such evidence is not generally accepted in the scientific community, Sebastian relies primarily on a 2009 report authored by the National Research Council of the National Academy of Sciences (NRC) entitled Strengthening Forensic Science in the United States: A Path Forward.[1] In that report, the NRC noted that toolmark identification has "never been exposed to stringent scientific scrutiny,"[2] involves "subjective qualitative judgments by examiners,"[3] is "based on unarticulated standards,"[4] and lacks any "statistical foundation for estimation of error rates."[5] The NRC concluded that, although there is some benefit to be derived from this testimony, additional studies are needed to address these concerns.

¶ 50 The circuit court denied Sebastian's motion for a *Frye* hearing, concluding that the criticisms raised in the NRC's report go to the weight, and not the admissibility, of toolmark and firearm identification evidence. The court also noted that there are no published opinions holding that such evidence is not generally accepted in the relevant scientific community.

---

[1]National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf.

[2]*Id.* at 42.

[3]*Id.* at 153.

[4]*Id.* at 153-54.

[5]*Id.* at 154.

¶ 51     In Illinois, "new" or "novel" scientific evidence is only admissible if it meets the standard set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *People v. McKown*, 226 Ill. 2d 245, 254, 257 (2007). "[T]he methodology or scientific principle upon which the opinion is based [must be] sufficiently established to have gained general acceptance in the particular field in which it belongs." (Internal quotation marks omitted.) *Id.* at 254. A court may determine whether a methodology or principle is generally accepted either by conducting an evidentiary hearing or "by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *Id.* A scientific methodology need not be universally accepted or even accepted by a majority of experts in the field; "[i]nstead, it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004). Although it is within the circuit court's discretion to decide both whether a particular witness is qualified to testify as an expert in a particular field and whether the testimony that witness will offer is relevant, we review *de novo* the circuit court's determination of whether the methodology used by the witness meets *Frye*'s "general acceptance" standard. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 52     We first consider whether toolmark and firearm identification evidence is "new" or "novel." The State contends that it is decidedly not, noting that courts have allowed such evidence since at least 1930, when our supreme court held in *People v. Fisher*, 340 Ill. 216, 240-41 (1930), that, while a jury is not bound to accept it as true, firearm identification evidence "is competent expert testimony on a subject properly one for expert knowledge." In the decades since *Fisher*, firearms experts have regularly testified in Illinois courts, for both the prosecution and the defense.

¶ 53     Sebastian does not dispute this but insists that, pursuant to our supreme court's analysis in *McKown*, firearm identification evidence is nevertheless novel because "there is no record that there has ever been a *Frye* hearing in Illinois to determine whether generally accepted scientific principles support [it]." The court in *McKown* held that the horizontal gaze nystagmus (HGN) test, a field sobriety test frequently used by police officers, was a novel methodology subject to the *Frye* standard. *McKown*, 226 Ill. 2d at 258. The court explained that its holding was based on "the history of legal challenges to the admissibility of HGN test evidence, and the fact that a *Frye* hearing ha[d] never been held in Illinois." *Id.* However, as the court noted, the HGN test was "repeatedly challenged in court, with varying degrees of success," both in Illinois and in other states, and this court had issued "divergent opinions on the topic," such that the general acceptance of the test "remain[ed] unsettled." (Internal quotation marks omitted.) *Id.* at 257.

¶ 54     This case is distinguishable from *McKown* because the admissibility of firearms identification evidence is not similarly "unsettled" in Illinois. The circuit court noted that it was unaware of any published opinion of any court stating that firearms evidence was not generally accepted in the scientific community, and Sebastian has cited none on appeal. The few out-of-state cases Sebastian cites—in which courts have raised concerns about the reliability of such evidence but have nonetheless held the methodology to be sufficiently reliable to be admitted, at least in some qualified form—do not create the same situation the *McKown* court was presented with, where legal challenges were resolved both for and against admissibility of the HGN test and the law was truly unsettled. See *United States v. Glynn*, 578

F. Supp. 2d 567, 569-75 (S.D.N.Y. 2008); *United States v. Monteiro*, 407 F. Supp. 2d 351, 355 (D. Mass. 2006); *United States v. Green*, 405 F. Supp. 2d 104, 120-24 (D. Mass. 2005).

¶ 55 Similarly unhelpful are cases involving testimony based on scientific methodologies that, although sometimes deemed admissible, never achieved the same sort of widespread acceptance as ballistics evidence. See *People v. Zayas*, 131 Ill. 2d 284, 296 (1989) (hypnotically refreshed testimony); *People v. Baynes*, 88 Ill. 2d 225, 244 (1982) (polygraph tests).

¶ 56 Although we understand the concerns raised by other courts and by the NCR in its report regarding the subjectivity of firearm identification testimony and the inability to test its accuracy, we cannot say that the circuit court erred in denying Sebastian's motion for a *Frye* hearing. Toolmark and firearm identification evidence is not new or novel, either pursuant to the plain meaning of those words or in accordance with the analysis employed by our supreme court in *McKown*. Far from being unsettled, the law in Illinois is consistent in its admission of such evidence. See *People v. Robinson*, 2013 IL App (1st) 102476, ¶ 80.

¶ 57 Nor do we find that the NCR's report so undermines the reliability of ballistics evidence that it has ceased to be "generally accepted" in the scientific community. We agree with the circuit court that the report's concerns go to the weight and not to the admissibility of such evidence. Indeed, our review of the record in this case indicates that—in connection with the his objection that some of Mr. Mayland's testimony lacked foundation, the denial of which Sebastian chose not to contest on appeal—during cross-examination defense counsel explored at length the limitations of Mr. Mayland's conclusions.

¶ 58 C. Retroactivity of Legislative Amendment

¶ 59 Shortly after Sebastian filed his notice of appeal, Public Act 99-258 was enacted (Pub. Act 99-258 (eff. Jan. 1, 2016)). Among other things, it amended section 5-130 of the Juvenile Court Act of 1987 to raise the age of automatic transfer from juvenile court to criminal court for an individual charged with first degree murder from 15 to 16 years of age (705 ILCS 405/5-130(1)(a) (West Supp. 2015)); amended the Unified Code of Corrections to require consideration of certain mitigating factors when sentencing individuals under the age of 18 in criminal court (730 ILCS 5/5-4.5-105(a) (West Supp. 2015)); and made firearm enhancements discretionary, rather than mandatory, for such individuals (730 ILCS 5/5-4.5-105(b) (West Supp. 2015)). In supplemental briefing, Sebastian argues that these amendments should apply to him retroactively.

¶ 60 In *People ex rel. Alvarez v. Howard*, 2016 IL 120729, ¶ 28, our supreme court recently held that the amendment to section 5-130 raising the age of automatic transfer to criminal court for defendants charged with first degree murder from 15 to 16 years of age applies retroactively to pending cases. The court explained that Illinois courts apply the two-step analysis set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), first asking "whether the legislature has clearly indicated the temporal reach of the amended statute" and—only where it has not—asking "whether the statute would have a retroactive impact." *Howard*, 2016 IL 120729, ¶ 19. The court explained further, however, that the general savings clause in section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)) provides a default statement of temporal reach where one is not otherwise provided. *Howard*, 2016 IL 120729, ¶ 20. Substantive changes generally apply prospectively and procedural changes apply retroactively.

*Id.* As a result of this savings clause, the court made clear that "an Illinois court will never need to go beyond step one of the *Landgraf* test." *Id.*

¶ 61    Noting both that nothing in the text of the amendment to section 5-130 itself indicates its temporal reach and that the effective date of January 1, 2016, was not expressly chosen by the legislature but applied by default, pursuant to the Effective Date of Laws Act (5 ILCS 75/1(a) (West 2014)), the *Howard* court determined that the general savings clause of section 4 of the Statute on Statutes applied. *Howard*, 2016 IL 120729, ¶¶ 21-23. As it had earlier held, in *People v. Patterson*, 2014 IL 115102, that " '[w]hether a defendant is tried in juvenile or criminal court is purely a matter of procedure,' " the court concluded that the amendment to section 5-130 should apply retroactively "unless doing so would offend the constitution." *Howard*, 2016 IL 120729, ¶ 28 (quoting *Patterson*, 2014 IL 115102, ¶ 104). Concluding that no such constitutional impediment applied, the court held that "the amendment applies to pending cases." *Id.* The *Howard* court agreed with the State that, under section 4, procedural amendments will only be applied retroactively "so far as is practicable" but rejected the State's contention that the inconvenience of transferring a case that had already been pending in criminal court for three years to juvenile court precluded retroactive application. *Id.* ¶ 32. The court explained that "practicable" is not synonymous with "convenient" but rather with "feasible." (Internal quotation marks omitted.) *Id.*

¶ 62    Although *Howard* involved a case pending in the circuit court, Sebastian argues the result should be the same for cases like his, pending on direct appeal. We agree. Only one panel of this court has concluded otherwise, in a pre-*Howard* decision that has since been appealed to the supreme court. See *People v. Hunter*, 2016 IL App (1st) 141904, ¶ 73, *appeal allowed*, No. 121306 (Ill. Nov. 23, 2016). We respectfully disagree with the reasoning in *Hunter* that, even where the general savings clause in section 4 of the Statute on Statutes provides the missing statement of intended temporal reach, an amendment may still not be applied retroactively if, pursuant to the second step of the *Landgraf* test, it will have a "retroactive impact." *Id.* ¶ 72. Our supreme court subsequently made quite clear in *Howard* that section 4 obviates the need for Illinois courts to ever reach the second step of that test. *Howard*, 2016 IL 120729, ¶ 20. We agree with our colleagues who concluded, in *People v. Scott*, 2016 IL App (1st) 141456, ¶ 46, that the holding in *Howard* applies to all pending cases. See also *People v. Patterson*, 2016 IL App (1st) 101573-B, ¶ 17 (pre-*Howard* decision reaching same result); *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 35 (same).

¶ 63    Because we hold that the amendment to section 5-130 increasing the minimum age for mandatory transfer of a defendant charged with first degree murder from 15 to 16 applies retroactively, we vacate Sebastian's sentence and remand his case to the juvenile court, where the State may elect to seek a discretionary transfer.

¶ 64    In light of this result, we reach neither Sebastian's argument that his original sentence was unconstitutional nor his alternative supplemental argument that he is entitled to a new sentencing hearing in criminal court pursuant to recent sentencing guidelines for defendants who were under the age of 18 at the time of their crimes. If, on remand, the juvenile court exercises its discretion to transfer Sebastian back to criminal court, it will be for the circuit court to consider the applicability of those statutory amendments in the first instance.

¶ 65                                    CONCLUSION

¶ 66        For the foregoing reasons, we vacate Sebastian's sentence, affirm the judgment of the circuit court in all other respects, and remand this case to the juvenile court.

¶ 67        Affirmed in part; sentence vacated; cause remanded.