2025 IL App (3d) 240567

Opinion filed August 22, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0567 Circuit No. 22-CF-123 |
| TRAVION D. TERRELL, | ) ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Peterson and Anderson concurred in the judgment and opinion.

**OPINION**

¶ 1       The State appeals from the trial court's order granting defendant's motion to suppress evidence obtained as a result of the execution of a search warrant for the content of defendant's cell phone records and denying its motion to reconsider. For the following reasons, we affirm in part, reverse in part, and remand the case for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3       Defendant, Travion D. Terrell, was charged with numerous felony offenses arising out of a January 15, 2022, shooting into a Chevrolet Tahoe, wherein Zania Walker and Jaron Nabors

were injured. Specifically, count I of the indictment alleged aggravated battery in violation of section 12-3.05(e)(1) and (h) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.05(e)(1), (h) (West 2022)); count II alleged aggravated discharge of a firearm in violation of section 24-1.2(a)(2) and (b) of the Code (*id.* § 24-1.2(a)(2), (b)); count III alleged reckless conduct in violation of section 12-5(a)(2) and (b) of the Code (*id.* § 12-5(a)(2), (b)); count IV alleged aggravated reckless driving in violation of sections 11-503(a)(1) and (c) of the Illinois Vehicle Code (625 ILCS 5/11-503(a)(1), (c) (West 2022)); counts V and VI alleged aggravated unlawful use of a weapon in violation of section 24-1.6(a)(1), (a)(3)(A-5), (a)(3)(C), and (d)(2) of the Code (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5), (C), (d)(2) (West 2022)) and section 24-1.6(a)(1), (a)(3)(C), and (d)(1) of the Code (*id.* § 24-1.6(a)(1), (a)(3)(C), (d)(1)), respectively; and count VII alleged violation of bail bond in violation of section 32-10(a-5) of the Code (*id.* § 32-10(a-5)) in that defendant knowingly violated a prior condition of bail bond to not possess a firearm.[1]

¶ 4                                    A. Complaint for Search Warrant

¶ 5            On January 19, 2022, Jeffrey German, a detective with the Investigations Division of the Joliet Police Department (JPD), presented a sworn complaint for search warrant, requesting a warrant to search all T-Mobile subscriber account information for T-Mobile cellular phones with the numbers of (***) ***-**17 and (***) ***-**54, along with "cellular call, texting, photos or other records for the same phone numbers under the control of T-Mobile," and to seize the call detail and data records and cellular-site location information from November 1, 2021, to January 19, 2022, and "Truecall/TDOA/Timing Advance Information" from January 13, 2022, to January 19, 2022. The complaint further specified items being sought, including, *inter alia*, addresses,

---

[1]The offenses charged in Counts V through VII (aggravated unlawful use of a weapon and violation of bail bond) were alleged to have occurred on January 21, 2022—a few days after the January 15, 2022, shooting.

telephone numbers, Social Security numbers, and dates of birth of subscribers; any email addresses associated with the account; phone call and text message records; subscriber information of any other T-Mobile customers identified in the call records; cell site and tower location; historical GPS information; location information; text message content; and cloud data. German recounted his 18-year employment with the JPD, including his involvement in over 1,000 felony-level investigations, certification as a lead homicide investigator, and certifications in forensic cell phone and call detail records.

¶ 6　　　　German's sworn complaint included a 12-page sworn "INVESTIGATION NARRATIVE," summarized in relevant part as follows. On January 15, 2022, at 3:22 p.m., the JPD responded to a 911 call reporting a three-vehicle crash near the Louis Joliet Mall, in which the driver of one vehicle had been shot. At the scene, a police officer spoke with Walker (the driver) and Nabors (the passenger and Walker's boyfriend). Nabors recounted that "a black or dark colored Chevrolet Impala or Malibu pulled up next to them on Ring Road and started to shoot at them at which time [Walker] was shot in her face." Nabors stated that they had first seen the dark colored vehicle when they pulled into a Hooters restaurant to get food. At the restaurant, the occupants of the dark colored vehicle (whom Nabors indicated he could not describe given the vehicle's dark tinted windows) were looking at Nabors and Walker, so Nabors told Walker to leave. Walker drove onto Mall Loop Drive, but the dark-colored vehicle followed and started to shoot at them. Walker was shot in the cheek, turned onto Tonti Drive, sped up, and then struck two vehicles at the intersection of Tonti Drive and Colorado Avenue. The dark-colored vehicle continued west on Mall Loop Drive. In the ambulance, Walker recounted that a dark-colored car followed them around the mall from Hooters and started shooting at them. After Walker was struck in the face, she kept driving until she hit other vehicles. Walker told German that she did

3

not recognize the dark-colored car or its occupants. Walker's Tahoe had a bullet hole in the driver's side window and tailgate, and three nine-millimeter shell cartridges were recovered on Mall Loop Drive near Tonti Drive.

¶ 7    German and JPD Detective Rutkoski also responded to the scene and met with Nabors, who was visibly distraught and had blood on his clothing and a bandage on his hand. When asked what happened, Nabors stated that he had already spoken with police officers. In response to whether he could repeat what happened, Nabors recounted that Walker had pulled into Hooters where they were planning to eat. However, Nabors saw a black Chevrolet Malibu following their car. At that point, Walker pulled out of the restaurant; the Malibu chased them; and the Malibu's occupants shot at them. Nabors stated that he did not know who shot at them or whether the shots came from the driver or passenger side. He further related that, prior to stopping at Hooters, he had been to Rise Recreational Dispensary (Rise) to purchase cannabis.

¶ 8    The detectives proceeded to Rise, where the manager shared video footage showing that, at approximately 3:21 p.m., Walker's Tahoe was traveling at a high rate of speed and was followed shortly after by a black Chevrolet Malibu or Impala, also traveling at a high rate of speed. The vehicles traveled off camera until approximately 3:22 p.m., at which point Walker's Tahoe was shown traveling on Tonti Drive and crashing into another vehicle at Tonti Drive and Colorado Avenue.

¶ 9    Another JPD detective met with Walker in a trauma area in the hospital emergency room. Hospital staff stated that Walker was shot in the left cheek with the bullet lodging in her cervical spine; Walker was stable but likely to be intubated and transported to another hospital for precautionary measures and for surgery to remove the bullet. Walker told the detective at the hospital that, after she and Nabors left Rise and arrived at Hooters to eat, she observed a black

4

Chevy vehicle with two male black occupants, and Nabors had apparently believed there was going to be a problem with the occupants of that car because he told her to go home. Walker stated that she was attempting to get away from the subjects in the black car and attempting to stop at stop signs to avoid a crash. She did not know exactly how the crash occurred, and she neither saw nor heard gunshots.

¶ 10    Initially, Walker did not identify anyone in the vehicle, but when her mother arrived, Walker told her that the passenger of the offending vehicle looked like "Junior Barfield." Walker subsequently clarified to the detective that she recognized the person in the passenger seat as Junior Barfield, whom she only knew through social media. Walker further stated that she did not see Barfield with a gun. Walker described Barfield as a "male black, approximately in his mid 20's, who had a child's mother named Nashay." Detective Rutkoski located a profile for Junior Barfield on Facebook. From previous incidents, Rutkoski knew the person in the profile picture as Levelle Barfield. According to a JPD report, Barfield had a child with Nashay Chambers, and, on August 27, 2019, Barfield shot their minor child in Nashay's presence at her home in Joliet.

¶ 11    Surveillance videos from Hooters showed that, at approximately 3:15 p.m. on the day of the shooting, Walker's Tahoe pulled into the parking lot through the rear entrance, then pulled around to the front of the parking lot by the front entrance before backing into a parking spot facing the front door to the restaurant. At approximately 3:16 p.m., a dark colored sedan pulled into the front parking lot and stopped in front of the Tahoe before backing into a parking spot facing the Tahoe. About a minute later, the Tahoe pulled out of the parking spot and looped around the side parking lot, followed by the sedan shortly thereafter. Both cars then traveled off camera.

5

¶ 12     Video footage from Rise's three exterior cameras (capturing Colorado Avenue between Voyager Lane and Tonti Drive) showed Walker's Tahoe traveling west on Colorado Avenue, passing Rise at approximately 3:20 p.m. The video then showed the offending vehicle traveling west on Colorado Avenue, passing Rise about 15 seconds later. According to German, based on the video footage and a video stillshot of the offending vehicle, it appeared to be "a black 2016-2018 Chevrolet Malibu with black rims."

¶ 13     German searched Flock Safety License Plate Recognition (Flock) cameras for "any black 2016-2018 Chevrolet Malibu vehicles with tinted windows and black rims that match the offender vehicle." He based the search criteria on "unique features such as chrome rear window trim which comes to a point unlike a Chevrolet Impala which has a different window trim" and the Malibu fog light that was only made between 2016 and 2018. Also, "Impalas typically have an Impala logo on each side of the vehicle." German searched in "Flock Safety" the criteria of "Black Chevrolet Sedan" in "the JPD, Crest Hill, and Shorewood cameras" from January 14, 2022, to January 17, 2022, for daylight views. He then compared the results of hundreds of vehicles for each day and located only one that was similar to the offending vehicle. "The vehicle appeared to be dirty with snow/salt on the passenger side of the vehicle on Flock Safety images on 01/15/2022 which is similar to the video surveillance of the offending vehicle." The offending vehicle and the vehicle identified on the Flock images—a Black 2018 Chevrolet Malibu with Illinois Registration *******—both had "heavily tinted windows as well as dark rims with a similar rim pattern and are within the same model year range." The January 15, 2022, Flock camera hits were at 12:44:57 p.m. at the Cass Street Bridge, traveling westbound, and at 12:52:30 p.m. at the McDonough Street Bridge, traveling eastbound.

6

¶ 14    A check of LEADS for the identified vehicle listed Travion Terrell and Tiffany Terrell as owners of the vehicle with a registration address of *** Plainfield Road in Joliet. German searched for them in Joliet Police Department records and other databases. He located Travion D. Terrell, born June 8, 2000, with the address of *** Plainfield Road in Joliet and a phone number of (***) ***-**54 (also listed as defendant's phone number in court records). A "ZetX TraX Carrier Lookup" search listed the number as a T-Mobile number. A search of open-source social media located two Facebook accounts with profiles and uploaded photos matching known booking photos of defendant. One of the profiles listed a Facebook friend with the account of "Junior Barfield."

¶ 15    JPD Officer Ben Briddell informed German that a confidential informant (who was working for "monetary purposes," did not have any pending court cases, and had been proven reliable, having provided information "more than five times which led to multiple Class X felony arrests, including seizures of Class X amounts of narcotics and multiple firearm seizures") advised that Levelle Barfield's current phone number was (***) ***-**17 and that Levelle had used the phone number "within the last seven days." A "ZetX TraX Carrier Lookup" search listed the number as a T-Mobile number. The confidential informant further stated that Levelle had "been known to drive in a black Chevrolet Malibu recently."

¶ 16    The final three pages of the investigative narrative in the sworn complaint for search warrant detailed investigations into other shootings and Barfield's connection to them, namely, shootings at **** Ruth Fitzgerald Drive in Plainfield on January 18, 2022, and December 7, 2021, and a shooting at **** (a different house number) Ruth Fitzgerald Drive in Plainfield on November 7, 2021. Shell casings recovered on December 7, 2021 "indicated a NIBIN link to a .40 caliber casings recovered from" the November 7, 2021, shooting. Home surveillance cameras

7

recorded a small white Ford SUV with tinted windows driving slowly near the scene minutes before one of the shootings. A Flock camera captured a small white Ford Escape SUV with tinted windows about three miles away from the scene of the shooting about three minutes after the shooting. The Ford Escape was registered to Jeraya McClellan, who had a child with "Levelle Barfield Jr." A December 22, 2021, police report reflected that Barfield rented a hotel room for Jeraya and that Jeraya was arrested for assaulting hotel employees after becoming upset with them for giving her room key to Barfield.

¶ 17     On January 18, 2022, a male black subject in a small white Ford Escape sped away from a police officer, while turning off its lights and disobeying a stop sign. The police officer lost sight of the vehicle, but assisting officers then saw the white Ford Escape unoccupied in a parking lot. A bystander reported seeing a male black subject hopping a fence and fleeing the area on foot, about 160 feet away from where the vehicle was parked. In plain view on the front passenger seat of the white Ford Escape was a semi-automatic handgun, and an iPhone was on the driver's seat.

¶ 18     German concluded that the T-Mobile cell phone provider records for (***) ***-**17 and (***) ***-**54 would show evidence related to the January 15, 2022, shooting, as well as the November 7, 2021, December 7, 2021, and January 18, 2022, shootings on Ruth Fitzgerald Drive. He requested records from November 1, 2021, to January 19, 2022 "to establish an accurate and reliable frequency report in reference to call patterns and location information." German stated that, based on his training and experience, the ability to establish such data could be exculpatory, *i.e.*, when "a subject is regularly at a location identified, the significance of the subject at that location may be diminished." He was also "aware that obtaining a subject's cell phone records and call detail records can assist in determining the location of the mobile device,

8

routes of travel, and communication to other individuals" and that failure to preserve the records could result in their deletion given cellular providers' varying retention periods.

¶ 19      The judge signed the search warrant on January 19, 2022, indicating that, "[u]pon examination of the written complaint, I find that said complaint on its face states facts sufficient to show probable cause for the issuance of a search warrant" for the specified records or data in the possession or control of T-Mobile, commanding that the records, documents, or data be seized for T-Mobile cellular phones with the numbers of (***) ***-**17 and (***) ***-**54, "along with cellular call, texting, photos or other records for the same phone numbers under the control of T-Mobile all of which constitute evidence of the offense of Aggravated Battery with Firearm." The warrant identified "Call Detail Records and cellular site location information" and "Data Records and cellular site location information" from November 1, 2021, to January 19, 2022, and "Truecall/TDOA/Timing Advance Information" from January 13, 2022, to January 19, 2022. The warrant further outlined the following categories of records and information (as requested in the complaint): (1) all customer information, including all customer identifying information; (2) the date, time, and location of where the device was purchased; (3) any e-mail address associated with the account; (4) call detail records in reference to all known outgoing and incoming calls, the dates and times the calls were made, and the duration of all calls made or received, as well as any records showing text messages or other data activity; (5) if requested, subscriber information for other T-Mobile customers identified in incoming or outgoing calls; (6) cell-site information, including all known cell towers associated with incoming and outgoing calls; (7) cell-site locations for all T-Mobile cell sites and sector information in the regional market associated with the requested cell-site information; (8) "Pen Register," meaning "a device or process which records or decodes dialing, routing, addressing, or signaling information

9

transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication," with a notation to "not provide the Pen Register and only provide the Historical GPS related information"; (9) location information, including "any estimated or known Longitude and Latitude of the cellular device's current location, or approximate location, information received by cell tower(s) in reference to direction and distance from the tower a device may be located (timing and triangulation information)" and which could be provided in the form of historical records; (10) "[a]ll text message and/or MMS messages, including message content, currently stored in the normal course of business for T-Mobile, to include any cloud services which allow for the long-term storage of both voicemails and SMS/MMS messages"; and (11) "Cloud Data, any content that may have been backed up to Cloud Storage for the listed dates/times."

¶ 20                                    B. Motion to Suppress

¶ 21        Defendant filed a pretrial "Motion To Suppress Evidence From Search Of Defendant's Phone Records As Search Warrant Was Issued Without Probable Cause," seeking to suppress: (1) all cell phone records returned as a result of the warrant; (2) "[a]ll fruits of the poisonous tree resulting from the use of this cell phone data," including defendant's statements and "the vehicle that was ultimately seized and towed and the firearm ultimately recovered from it"; and (3) "[a]ll other knowledge and fruits thereof, which is the direct and indirect product of the seizure and arrest." Defendant argued that the search warrant amounted to an unlawful "fishing expedition" that "resulted in the T-Mobile location data, as well as other information, being used to implicate the Defendant in the shooting." According to the motion, after obtaining "this information," JPD and the Will County Sheriff's Office "detained the Defendant and [JPD] subjected him to a

10

custodial interrogation with respect to the shooting." In addition, defendant argued that the good-faith exception to the exclusionary rule did not apply for two reasons. First, defendant argued that the evidence presented as a basis to obtain defendant's phone records "was so limited as to effectively constitute a 'bare bones' search warrant." Distilled to its essentials, defendant's position was that the basis for the warrant was that a vehicle similar to the offending vehicle had been seen on surveillance video approximately two and a half hours before the shooting and miles away and that defendant was Facebook friends with Barfield. Specifically, relying upon maps attached as exhibits to his motion to suppress, defendant argued that the crash occurred at approximately 3:22 p.m., and the Flock camera hits were at 12:44:57 p.m. at the Cass Street Bridge (5.5 miles from the shooting) traveling westbound, and at 12:52:30 p.m. at the McDonough Street Bridge (6.4 miles from the shooting) traveling eastbound—the opposite direction from the shooting. Second, defendant argued that the good-faith exception did not apply because the warrant was "so facially deficient that the executing officers cannot reasonably presume it to be valid." Specifically, defendant argued that, despite German's claim that evidence of "other shootings linked to Levelle Barfield" could be found on defendant's phone, there was "no indication, hunch or otherwise, that [defendant's] phone would be linked to the shootings Detectives asserted may have been committed by Levelle Barfield." Moreover, defendant asserted that "the scope of the search warrant was not narrowly tailored and asked for all of his cell phone information."

¶ 22     The State responded that there was probable cause for the issuance of the search warrant, given that the vehicles in the Flock images and Rise surveillance were the same. According to the State, German used very specific criteria to identify defendant's car on the Flock cameras, *i.e.*, any black 2016-2018 Chevrolet Malibu vehicles with tinted windows and black rims that

11

matched the offender vehicle. The search yielded only one matching vehicle—defendant's Malibu, which, like the offending vehicle, also appeared to be dirty with snow and salt on the passenger side. Further, defendant's Facebook account reflected that he was Facebook friends with Barfield, whom Walker identified as being the passenger in the offending vehicle. The State also acknowledged in its response that "[t]he complaint also detailed approximately 4 pages of information for 3 unrelated shootings that police suspected Levelle Barefield [*sic*] to be involved in."

¶ 23    Regarding the scope of the records requested, the State argued:

"Another of defendant's complaints appears to be that the search warrant was overbroad, in that it requested certain data from the cell phones[;] however, save for listing the data requested, defendant makes no assertion why this request is overbroad. The plain language of the warrant issued in this case limits the scope of the search to specific file types and to evidence related to the offense with which the defendant was charged. The fourth amendment's particularity requirement with respect to cell phones may be satisfied by describing the 'nature of the items to be searched for *** without precise specification of file names or locations.' *People v. Zarif*, 2023 IL App (3d) 210176-U, ¶ 32. The items described in the search warrant sought by police in this case were, therefore, particular to the crime under investigation. Thus, the search warrant issued in this case met the fourth amendment's particularity requirements and the warrant's scope was not overly broad."

¶ 24    The State also argued that, to the extent defendant challenged the search warrant as overbroad, the warrant was not in fact overbroad since its scope was limited to specific file types and evidence related to the offense with which defendant was charged. In addition, the State

12

argued that, even if the trial court disagreed that the warrant was supported by probable cause, the good-faith exception to the exclusionary rule precluded suppression of the evidence. The State disputed that the warrant and affidavit were bare-bones or that the officers unreasonably relied on the warrant, given the supporting information alleged.

¶ 25 Following argument, on June 21, 2024, the trial court first recounted "[t]he connection in the search warrant, from what I can see," including (1) "they connect your client to [Barfield] due to the fact that your—the car was registered to the defendant and Tiffany Terrell"; (2) defendant and Barfield were Facebook friends; (3) "[t]here was a CS that said something about Barefield [*sic*] known to be seen in a black sedan as opposed to actually seeing them"; (4) the car used in the shooting of Walker was a black sedan; (5) three hours after the shooting, Walker described the car and stated her belief that the front passenger was Barfield and that there were two black makes in the car but "no ID on who was driving the car" and "[d]idn't see a gun"; (6) defendant co-owned a similar car with a female; and (7) the car registered to defendant and Tiffany was seen traveling west on Cass Street and east at the McDonough Street bridge at 12:44 p.m., and 12:52 p.m., respectively. The trial court concluded that, "based upon all the evidence and arguments on this four corner motion, I find that there was no probable cause to issue the warrant as to [defendant's] phone records based upon what's in the four corners of this search warrant." Accordingly, the trial court entered an order finding that "there was no probable cause to issue search warrant for the T-Mobile phone records relating to the phone number attributed to [defendant]," granting defendant's motion to suppress, and holding that "any phone

13

records obtained from the search warrant shall be excluded from trial and future hearings, limited to this Defendant's records only."[2]

¶ 26 The State filed a motion to reconsider, reiterating its argument that there was probable cause to issue the warrant and that the good-faith exception to the exclusionary rule applied. The State argued that an affidavit in support of a search warrant is presumed valid and that the trial court failed to show proper deference to the warrant-issuing judge's probable cause determination. The State also requested that the trial court consider the original search warrant, which included color photographs of the offending vehicle and the vehicle in the Flock images, rather than the copy, which had contained only black and white copies of the photographs. The trial court ultimately agreed to do so.

¶ 27 In opposition to the motion to reconsider, defendant argued that the trial court properly determined that there was no probable cause for a search of defendant's phone records. Defendant maintained there was not a substantial basis for concluding that evidence of the shooting would be contained in defendant's cell phone records and that the complaint for search warrant attempted to establish probable cause for the January 15, 2022, shooting by alleging a connection to Barfield and the Ruth Fitzgerald Drive shootings. Defendant also reiterated that the good-faith exception to the exclusionary rule did not apply because German's complaint was bare-bones and because the warrant was so facially deficient that the executing officers could not reasonably presume its validity. Defendant further argued that—given the stated purpose of requesting phone records from November 1, 2021, to January 19, 2021, to establish an accurate and reliable frequency report regarding call patterns and location information—the scope of the

---

[2]The trial court's ruling did not address defendant's request to suppress evidence related to the search of defendant's car and defendant's statements as fruit of the poisonous tree.

14

search warrant was exceedingly broad in its request for all the delineated categories of data. According to defendant,

> "the Detectives attempted to obtain and read Defendant's text messages, data activity including internet activity, and call data in addition to location data. This shows a disregard for the protections of the Constitution and suggests that Officers did not reasonably believe they had probable cause for all of Defendant's cell phone records."

Moreover, defendant asserted that the timeframe for the request began on November 1, 2021, because information about unrelated shootings was included in the application.

¶ 28    Following briefing and argument, on August 27, 2024, the trial court denied the State's motion to reconsider. The trial court noted that it had given "great deference" to the warrant-issuing judge's decision but that there was no probable cause for the warrant. The trial court reasoned that the information in the complaint about the other shootings, which comprised "I don't know, 50, 60 percent of the search warrant" and "had nothing to do with this defendant," had "confused everything" and "obscured the whole warrant." Moreover, the trial court held that the good-faith exception to the exclusionary rule did not apply because the warrant was based on an affidavit that was bare-bones such that it was unreasonable to believe that there was probable cause. The trial court noted that it was a "great warrant" for Barfield, given "he's all over there." However, the trial court found that, "as far as this defendant, the only thing that I see that he even has anything to do with the defendant [*sic*], that he's one of two owners of the car that most likely or possibly was involved" and that he was Facebook friends with Barfield. The trial court pointed out that, while there was a search on the Flock cameras for four days, "the only time that car shows up is two hours before the alleged shooting near the mall." Accordingly, the trial court denied reconsideration of its order granting defendant's motion to suppress.

15

¶ 29    The State filed a certificate of impairment and notice of appeal pursuant to Illinois Supreme Court Rule 604(a)(1) (eff. Apr. 15, 2024).

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, the State argues that the trial court's probable cause determination was erroneous and that, even if the complaint for search warrant and accompanying affidavit lacked sufficient facts to support probable cause, the evidence was admissible under the good-faith exception to the exclusionary rule. As explained below, we agree that there was probable cause to search defendant's phone records regarding the January 15, 2022, shooting. However, we disagree that there was probable cause as to the Ruth Fitzgerald Drive shootings and further hold that the good-faith exception to the exclusionary rule does not apply to evidence relating to the Ruth Fitzgerald Drive shootings.

¶ 32    The fourth amendment of the United States Constitution and article I, section 6 of the Illinois Constitution of 1970 protect the right of individuals to be free from unreasonable searches and seizures and require that search warrants be supported by probable cause. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A detached judicial officer must resolve whether there is sufficient probable cause to justify the issuance of a search warrant. *People v. Manzo*, 2018 IL 122761, ¶ 29. A sworn complaint in support of a search warrant is presumed valid, and the resolution of "doubtful or marginal cases" should be resolved by the preference for searches based on warrants. *Id.* ¶¶ 31-32. A "reviewing court must not substitute its judgment for that of the magistrate in construing an affidavit but must instead merely decide whether the magistrate had a substantial basis for concluding that probable cause existed." *Id.* ¶ 31 (citing *People v. McCarty*, 223 Ill. 2d 109, 153 (2006)).

16

¶ 33        Probable cause exists if the totality of the facts and circumstances known to the affiant at the time of application is sufficient to warrant a person of reasonable caution to believe that the law was violated and that evidence of the offense is at the location to be searched. *Id.* ¶ 29. There must be an established nexus, which may be drawn by reasonable inferences, between the place to be searched and the evidence sought. *Id.* ¶ 35; *People v. Rojas*, 2013 IL App (1st) 113780, ¶ 15. The standard for determining the existence of probable cause is the probability of criminal activity rather than proof beyond a reasonable doubt. *Manzo*, 2018 IL 122761, ¶ 29. "Whether the necessary probability exists is governed by commonsense considerations that are factual and practical, rather than by technical rules." *Id.* ¶ 30. In addition to the requirement that a warrant be supported by probable cause, the warrant must include a particularized descriptions of " 'the place to be searched' " and " 'the persons or things to be seized.' " *People v. McCavitt*, 2021 IL 125550, ¶ 56 (quoting U.S. Const., amend. IV).

¶ 34        A trial court's ruling on a motion to suppress evidence presents questions of both fact and law. *Manzo*, 2018 IL 122761, ¶ 25. We will not reverse the trial court's findings of fact unless they are against the manifest weight of the evidence. *Id.* We review *de novo* the issue of whether the trial court properly granted a motion to quash a search warrant and suppress evidence. *Id.* Here, there was no evidentiary hearing, and we are in essentially the same position as the trial court; thus, we review the order granting the motion to suppress *de novo*. See *Rojas*, 2013 IL App (1st) 113780, ¶ 16 ("[B]ecause there was no evidentiary hearing on the defense motion, and we are essentially presented with the same complaint and search warrant as the trial court, our review of the order granting the motion to suppress is *de novo*."). Our review of the magistrate's decision to issue the search warrant remains deferential. *Id.*

17

¶ 35    We turn first to the State's argument that the trial court erred because the facts set forth in the complaint for search warrant and affidavit sufficiently established probable cause to search defendant's phone records. In setting forth the totality of the facts and circumstances presented to the warrant-issuing judge, the State highlights the distinctive similarities between the offending vehicle and the vehicle that was seen in the Flock images. Defendant counters that the connection between the two vehicles was "tenuous at best." According to defendant, Walker and Nabors did not identify the license plate number of the offending vehicle; a Chevrolet Malibu is a common make and model; and the mere fact that a vehicle similar to the offending vehicle was seen approximately two and half hours before the shooting, at locations 5.5 miles and 6.4 miles away, and in a densely populated area, was insufficient to establish that the vehicles were the same.

¶ 36    While the license plate number was not identified, the police officers conducted a focused investigation in their search for the offending vehicle. As German averred, the criteria to search for the offending vehicle in the Flock images was particularized—a black 2016-2018 Chevrolet Malibu vehicle with tinted windows, black rims, and "unique features such as chrome rear window trim which comes to a point unlike a Chevrolet Impala which has a different window trim" and a certain fog light that was only made between 2016 and 2018. German compared the results from the search of the Flock images, yielding hundreds of vehicles for the four-day time period of the search, and located only one with features similar to those of the offending vehicle. The vehicle identified also appeared to be dirty with snow and salt on the passenger side—again, consistent with that of the offending vehicle. Based upon these similarities, and notwithstanding that the Flock images of defendant's vehicle were captured approximately two and a half hours

18

earlier some five to six miles away from the location of the incident, it was reasonable to conclude that defendant's vehicle was the offending vehicle.

¶ 37     Assuming for the sake of analysis that his car was the offending vehicle, defendant argues it was unreasonable to assume that he was in the vehicle at the time of the incident because he co-owned the Malibu with Tiffany Terrell and he was not identified as being in the vehicle. However, German's affidavit recounted Walker's statement that she observed two black *male* occupants in the offending vehicle, and defendant does not dispute that he was the only male owner. As the State argues, it is a commonsense inference that a vehicle's owner is its driver (see *Kansas v. Glover*, 589 U.S. 376, 381 (2020); *Village of Lake in the Hills v. Lloyd*, 227 Ill. App. 3d 351, 353 (1992); *People v. Barnes*, 152 Ill. App. 3d 1004, 1006 (1987)). Furthermore, defendant's Facebook account reflected that he was Facebook friends with Barfield, whom Walker identified as being the passenger in the offending vehicle. As for defendant's suggestion that the dark tinted windows precluded Walker from identifying the occupants in the offending vehicle as black males and one of the occupants as Barfield, German's affidavit recounted Walker's statement that she made these identifications. We accept these statements by Walker because, absent evidence challenging its veracity, the information set forth in a sworn complaint seeking a search warrant is presumed true. See *McCarty*, 223 Ill. 2d at 154 (citing *People v. Gardner*, 121 Ill. App. 3d 464, 467 (1984)). Under these circumstances, it was reasonable to assume defendant was in his vehicle at the time of the shooting.

¶ 38     Finally, defendant maintains that, even if the above facts established that he was present in the offending vehicle at the time of the shooting, the complaining officer improperly assumed that he was in possession of his cell phone at the time and that his phone records contained evidence of the offense. We disagree. Initially, it is a reasonable, commonsense inference that

19

defendant was in possession of his cell phone while in his car. See *Riley v. California*, 573 U.S. 373, 395 (2014) ("Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception."). Moreover, German's affidavit reflects more than an assumption that the cell phone records would show evidence related to the January 15, 2022, shooting, stating that, based upon his training and experience, obtaining a subject's cell phone records and call detail records may assist in determining the location of the mobile device, routes of travel, and communication to other involved individuals.

¶ 39    In this regard, we parenthetically note defendant's contention (argued in the context that the good-faith exception to the exclusionary rule does not apply) that the warrant authorized a search "into the entire contents of [defendant's] cell phone records for an approximately 14 and a half month time period." This assertion is factually inaccurate. The search warrant authorized call detail records, data records and cellular site location information for the less than three-month time period from November 1, 2021, to January 19, 2022, and "Truecall/TDOA/Timing Advance Information" for the one-week time period from January 13, 2022, to January 19, 2022. We further note that, in response to defendant's contention, the State cites the unpublished order in *People v. Weis*, 2022 IL App (5th) 210076-U. There, the court rejected the defendant's overbreadth challenge to a warrant that authorized a search for, *inter alia*, " 'all data within' " the defendant's phone and " 'any or all' " things that were " 'used in the commission of or may constitute evidence of the offense(s) in connected with which this warrant is issued, being Criminal Sexual Assault,' " as the language was no more broad than that found permissible in *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018), allowing a search warrant "to look at every file on [the defendant's] phone" to search for evidence related to the crimes listed in the warrant. *Weis*, 2022 IL App (5th) 210076-U, ¶¶ 61-62 (citing *Bishop*, 910 F.3d at 336-37).

¶ 40        Accordingly, as to the January 15, 2022, shooting, we agree with the State that the totality of the facts and circumstances presented to the warrant-issuing judge were sufficient to lead a person of reasonable caution to believe that the law was violated and that evidence of the offense would be found in defendant's cell phone records. See *Manzo*, 2018 IL 122761, ¶ 29. Keeping in mind the preference for searches based on warrants and according due deference to the warrant-issuing judge's determination, we hold that the judge was provided with a substantial basis to conclude that there was probable cause for issuance of the search warrant as it relates to the January 15, 2022, shooting.

¶ 41        While we have concluded that there was probable cause as it relates to the January 15, 2022, shooting, we reach the opposite conclusion as it relates to the search of defendant's cell phone records concerning the Ruth Fitzgerald Drive shootings. German's complaint for search warrant stated that defendant's cell phone records would show evidence related not just to the January 15, 2022, shooting, but also to the November 7, 2021, December 7, 2021, and January 18, 2022, shootings on Ruth Fitzgerald Drive. He therefore requested the records from November 1, 2021, to January 19, 2022, to establish a frequency report regarding call patterns and location information. In turn, the warrant identified "Call Detail Records and cellular site location information" and "Data Records and cellular site location information" from *November 1, 2021* (six days before the first Ruth Fitzgerald Drive shooting but over two months before the January 15, 2022, shooting) to January 19, 2022, and "Truecall/TDOA/Timing Advance Information" from January 13, 2022, to January 19, 2022. Yet the affidavit established no connection between defendant and the Ruth Fitzgerald Drive shootings, and the State makes no persuasive argument that there is any nexus between defendant's cell phone records and the Ruth Fitzgerald Drive shootings. Thus, the judge was not provided with a substantial basis to conclude

21

that there was probable cause for issuance of the search warrant as it relates to the Ruth Fitzgerald Drive shootings.

¶ 42    The State argues that, even if this court were to hold that the search warrant was not supported by probable cause, the evidence was nonetheless admissible because the officers relied in good faith on the search warrant. We address this argument as it pertains to issuance of a search warrant relating to the Ruth Fitzgerald Drive shootings.

¶ 43    The exclusionary rule provides for suppression of evidence obtained in violation of the protection against unreasonable searches and seizures. *Rojas*, 2013 IL App (1st) 113780, ¶ 15 (citing *United States v. Leon*, 468 U.S. 897, 906 (1984), and citing *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). The purpose of the rule is to deter law enforcement from recklessly preparing search warrant affidavits and obtaining warrants based on false or misleading information. *Id.* However, the good-faith exception to the exclusionary rule prevents suppression of evidence obtained by a police officer acting in objectively reasonable reliance on a facially valid warrant later found invalid for lack of probable cause. *Manzo*, 2018 IL 122761, ¶ 63; see 725 ILCS 5/114-12(b)(1) (West 2022) (a court should not suppress otherwise admissible evidence if a police officer seized the evidence in good faith); *id.* § 114-12(b)(2)(i) (" '[g]ood faith' " means whenever a peace officer obtains evidence "pursuant to a search or an arrest warrant obtained from a neutral and detached judge, which warrant is free from obvious defects other than non-deliberate errors in preparation and contains no material misrepresentation by any agent of the State, and the officer reasonably believed the warrant to be valid"). For this reason, a police officer's decision to obtain a search warrant " 'is *prima facie* evidence that he was acting in good faith.' " *People v. Bryant*, 389 Ill. App. 3d 500, 525 (2009) (quoting *United States v. Peck*, 317 F.3d 754, 757 (7th Cir. 2003)).

22

¶ 44    To rebut the *prima facie* evidence of good faith, a defendant must demonstrate that " 'the magistrate simply rubber-stamped the warrant application, the officers were dishonest or reckless in preparing the affidavit, or the warrant was so lacking in probable cause that no officer could have relied on it.' " *Id.* (quoting *Peck*, 317 F.3d at 757). Here, defendant argues, *inter alia*, that the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. See *Manzo*, 2018 IL 122761, ¶ 64 (citing *Leon*, 468 U.S. at 923). A police officer may not " 'obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.' " *Id.* (quoting *Leon*, 468 U.S. at 923 n.24). A bare-bones affidavit is " 'one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." ' " *Id.* ¶ 67 (quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017), quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

¶ 45    As it pertains to issuance of a search warrant relating to the Ruth Fitzgerald Drive shootings, the warrant was based on an affidavit that was bare bones such that it was unreasonable to believe that there was probable cause. In reaching this conclusion, we consider a line of cases, including *Rojas*, where the appellate court rejected the State's argument that the good-faith exception applied to the search of the defendant's home. *Rojas*, 2013 IL App (1st) 113780, ¶ 22. The State in *Rojas* asserted that the complaint was not bare bones because " 'it set forth details of an extensive investigation and described the affiant agent's considerable experience,' together with evidence of defendant's ongoing criminal activity" and, thus, the officer's belief in the validity of the warrant was not unreasonable. *Id.* In concluding otherwise, the appellate court held, "While the 20-page complaint is not bare-bones in and of itself, *it is*

*bare-bones with regard to defendant's Cromwell address.* As stated, the nearly two pages of 'probable cause' evidence attempting to create a nexus between defendant's criminal drug trafficking activity and his family's Cromwell home was entirely lacking." (Emphasis in original.) *Id.*

¶ 46      Similarly, here, the lengthy complaint presented no factual basis for concluding that evidence of the Ruth Fitzgerald Drive shootings would be found in defendant's cell phone records; at best, it only established a connection between *Barfield* and the Ruth Fitzgerald Drive shootings. Thus, as it pertains to issuance of a search warrant for defendant's phone relating to the Ruth Fitzgerald Drive shootings, the warrant was based on an affidavit that was bare bones such that it was unreasonable to believe that there was probable cause. Accordingly, we reject the State's reliance on the good-faith exception to the exclusionary rule for the evidence relating to the Ruth Fitzgerald Drive portion of the warrant. Having so concluded, we do not reach defendant's alternative arguments for why the good-faith exception to the exclusionary rule should not apply.

¶ 47      Notwithstanding, the State urges that, "[s]hould this court find that any part of the warrant was invalid, the remainder of the warrant would remain valid and items not tainted by the invalid portions should not be suppressed." In support, the State cites *People v. Zarif*, 2023 IL App (3d) 210176-U, ¶ 35 ("The partial invalidity of a warrant does not taint the entire warrant, and the invalid portion can be extracted from the warrant and the tainted items suppressed." (citing *People v. McCoy*, 135 Ill. App. 3d 1059, 1067 (1985) (same))). Ultimately, the State requests a remand for the trial court to identify which portions of the warrant were invalid and "what evidence related to valid portions and thus need not be suppressed." Defendant counters that the State forfeited this argument by failing to raise it in the trial court and by failing

24

to develop the argument in its opening brief in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). The State disagrees that it forfeited the argument, noting, *inter alia*, that it had no occasion to make this request in the trial court, since the trial court did not base its holding on overbreadth of the warrant. According to the State, "[t]here was no determination made by the trial court that any part of the warrant was overly broad, so there was no explicit determination that evidence like location data was not within a proper scope."

¶ 48    We agree with the State and decline to find forfeiture. While the State did not squarely seek a determination as to the partial validity of the warrant, the State made a similar argument in response to defendant's overbreadth claim below. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 76 ("We require parties to preserve issues or claims for appeal; we do not require them to limit their arguments here to the same arguments that were made below."). Namely, the State addressed the scope of the records requested in arguing that the items sought in the search warrant met the fourth amendment's particularity requirement, citing *Zarif*, 2023 IL App (3d) 210176-U—the same (unpublished) order upon which it now relies in support of its argument regarding the partial validity of a warrant and request for a remand.

¶ 49    Moreover, the doctrine of severance and its availability as a remedy is well established. As the appellate court in *McCoy* noted, "[I]t is generally held that partial invalidity of a search warrant does not taint the whole warrant." *McCoy*, 135 Ill. App. 3d at 1067 (citing *People v. Hellemeyer*, 28 Ill. App. 3d 491, 497-98 (1975)); accord *People v. Cooke*, 299 Ill. App. 3d 273, 280 (1998). Rather than quashing a search warrant in its entirety, "[a] court will just sever the tainted part from the rest of the warrant," with "[t]he only apparent condition [being] that the scope of the search pursuant to a severed warrant must be limited to only the untainted items."

*McCoy*, 135 Ill. App. 3d at 1067-68 (citing 2 Wayne R. LaFave, Search and Seizure § 4.6(f), at 111-12 (1978)).

¶ 50      *Hellemeyer* is illustrative. There, the appellate court rejected the argument that the entire search warrant was invalid where the complaint established probable cause to believe that items stolen from a particular tavern may be found in the defendant's car, albeit not items stolen from certain other taverns. *Hellemeyer*, 28 Ill. App. 3d at 497-98. Similarly, here, as discussed *infra*, excising the Ruth Fitzgerald Drive shootings from the search warrant complaint, there was probable cause to search defendant's cell phone records as requested relating to the January 15, 2022, shooting. The partial invalidity of the search warrant for defendant's phone records related to the Ruth Fitzgerald Drive shootings does not require that the entire search warrant be quashed. Rather, the appropriate remedy is a remand for the trial court to determine what evidence relates to the January 15, 2022, shooting and what evidence relates to the Ruth Fitzgerald Drive shootings, after which the trial court shall suppress only the Ruth Fitzgerald Drive evidence.

¶ 51      In sum, we hold that there was probable cause to search defendant's phone records regarding the January 15, 2022, shooting. However, there was no probable cause as to the Ruth Fitzgerald Drive shootings, and the good-faith exception to the exclusionary rule does not apply to evidence relating to the Ruth Fitzgerald Drive shootings. Accordingly, we remand for the trial court to determine what evidence relates to the January 15, 2022, shooting and what evidence relates to the Ruth Fitzgerald Drive shootings, after which the trial court shall suppress only the Ruth Fitzgerald Drive evidence.

¶ 52                                    III. CONCLUSION

¶ 53          For the foregoing reasons, we affirm in part and reverse in part the judgment of the

circuit court of Will County and remand the case for further proceedings consistent with this

order.

¶ 54          Affirmed in part and reversed in part; cause remanded.

*People v. Terrell*, 2025 IL App (3d) 240567

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 22-CF-123; the Hon. Amy M. Bertani-Tomczak, Judge, presiding. |
| **Attorneys for Appellant:** | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Laura Bialon, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | James E. Chadd, Santiago A. Durango, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellee. |